## WEED *et al. v.* GAINESVILLE, JEFFERSON & SOUTHERN RAILROAD COMPANY *et al.*

Proceedings were begun in 1897 to foreclose, on the Gainesville, Jefferson & Southern Railroad Company, a mortgage securing an issue of $245,000 of bonds. It appeared that $83,500 of these bonds had been sold to the plaintiffs in error at from 75 to 85; and that the remaining $161,500, together with $130,000 of the Gainesville Company's capital stock, had been sold, on March 31, 1883, to the Georgia Railroad Company for $145,350. Some of the parties to the case insisted that this was a sale of stock at par, with the bonds as a bonus, and therefore usurious. Others contended that it was a sale of bonds at 90, with the stock as a bonus, and that therefore the purchaser was liable for $130,000 as on an unpaid subscription. The purchaser contended that the sale was of the stocks and bonds, as a unit, to it acting as a construction company, with a contemporaneous understanding under which it had expended $107,000 additional in completing the Gainesville Railroad. The $161,500 of bonds were indorsed by the Georgia Railroad Company, and sold to purchasers at 105, they having no notice of the terms of the original issue. Intervening bondholders contended that the $83,500 of bonds should be first paid out of the proceeds of the mortgaged property; and that the purchase of the stock was ultra vires, and tended to lessen competition. They prayed for a marshaling of assets, and that the Georgia Company be required to account for profits made, and for its management of the Gainesville Company. The latter company answered and filed a plea of set-off for $365,000. *Held:*

1. The completion of the Gainesville road by the Georgia Company did not lessen or defeat competition, but created competition where none previously existed.
2. The State, the stockholders, and the parties alone could attack the contract as being ultra vires or in restraint of trade. Bondholders could not do so.
3. The trustees under the mortgage represent all the bondholders. Where bondholders are allowed to intervene to represent their special contention, and one of the class dies before the decree, the case does not abate, nor is it necessary to have the deceased bondholder's representative made a party before the litigation can proceed.
4. It is not necessary to have all the bonds proved before decree of foreclosure, but proper provision can be made for proof thereof before the master, in the order providing for the disposition of the proceeds of sale.
5. The fact that some of the bonds were indorsed did not make the rule of two funds applicable. The indorsement was not a lien, not equally accessible, and was not even a liability of the common debtor.

6. In actions at law the constitutional right to a trial by jury requires that exceptions of fact to an auditor's report shall be submitted to a jury.

7. There is no such provision as to equity cases ; and on exceptions of fact to an auditor's report therein, if there is evidence to sustain the finding, and the chancellor is satisfied therewith, he need not refer the exceptions to a jury.

8. If the evidence is so conflicting as to leave the chancellor in doubt, he may refer the exceptions to a jury.

9. If the chancellor is dissatisfied with the finding because it is without evidence, or contrary to the evidence, the statute does not permit him to sustain the exception finally, but requires that it be submitted to a jury, even though he would feel bound to grant a new trial if the exception were not sustained by the verdict.   Civil Code, § 4595.

10. In the present case there was evidence to support the auditor's report, and there was no error in overruling the exceptions to his findings of fact.

11. If the purchase-price ($143,500) was in payment of $161,500 at 90, and the stock was a bonus, the liability of the original purchaser and subscriber as for unpaid subscriptions was barred by the statute ; and the same would be true as to any claim of forfeiture for excessive interest.   Civil Code, § 2891.

12. If the purchaser, on an accounting, was liable in any sum, it had a set-off against the Gainesville Company for $365,000, and the plaintiffs in error would have no right to a reversal under the prayer to marshal the assets, since on no theory of the evidence would the Georgia Company's liability exceed its set-off for $365,000.

13. If the finding on the plea of set-off was too large, it was harmless as against intervening bondholders, who were entitled under the decree to payment of their first lien before anything could be received on the judgment for set-off.

14. An intervening bondholder could not object to a stockholder dismissing its exceptions to the auditor's finding as to there being no usury, nor use the exceptions as the basis for an original assignment of error to this court.

15. The decisions as to the effect of usury on negotiable instruments in the hands of bona fide purchasers for value are based on *Bailey* v. *Lumpkin*, 1 *Ga.* 407, which construed a statute (Cobb's Dig. 393) expressly making all notes and bonds void as to excessive interest.   (Lamar, J.)

16. The present statute (Civil Code, § 2886) makes no such declaration, and, under the Civil Code, § 3694, the consideration must be both illegal and immoral in order to prejudice the rights of a bona fide holder of negotiable paper.   *Perkins* v. *Rowland*, 69 *Ga.* 664 ; *Rhodes* v. *Beall*, 73 *Ga.* 641. (Lamar, J.)

17. The defense of usury is not good as against a bona fide purchaser of corporate bonds for value, without notice, and before maturity.·   Civil Code, § 3694.   (Lamar, J.)

Argued December 7, 1903.—Decided March 3, 1904.   Rehearing denied March 5, 1904.

Exceptions to auditor's report.   Before Judge Kimsey.   Hall superior court.   July 21, 1903.

The Gainesville, Jefferson & Southern Railroad Company (hereinafter referred to as the Gainesville Company) was incorporated

by an act approved August 25, 1872 (Acts 1872, p. 333), to con-
struct a railroad from Gainesville, by way of Jefferson, to some
point to be selected by it on the Georgia Railroad.   The minimum
capital stock was $250,000.   The company was authorized, by
acts of August 3, 4, 1881, to mortgage its property and franchises,
and consolidate with connecting lines (Acts 1880–81, pp. 241,
242).   The full capital stock required was not subscribed, and
many of the subscriptions made were not paid in; but the com-
pany began the construction, and issued a mortgage to secure
$245,000 of bonds, of which $83,500 were sold in open market,
at prices of from 75 to 85.   These $83,500 of bonds are referred to
in the record as "unindorsed bonds."   The money derived from
their sale, and from stock subscriptions, including one for 500
shares from the City of Gainesville, was spent in the construc-
tion of about 15 miles and grading 23 miles out of a total of 65
miles of the road leading from Gainesville towards Monroe.   In
1883, being entirely without funds, and unable to secure subscrip-
tions to its stock or to sell the remaining $161,500 of first mort-
gage bonds, the company, through its president A. D. Candler, en-
tered into negotiations with the Georgia Railroad Company (lessee
of the Georgia Railroad & Banking Company) with a view to pro-
cure funds to complete the road and devise a plan for its success-
ful operation thereafter.   The contract of March 31, 1883, be-
tween the Gainesville Company and the Georgia Company recited,
that, in consideration of $145,350 to be paid by the Georgia Com-
pany, the Gainesville Company sold, transferred, and delivered to
the Georgia Company 2,600 shares (par $50) of the Gainesville
Company's capital stock fully paid up, and $161,500 of first mort-
gage bonds, the same to be paid in fourteen installments, aggregat-
ing $100,462.46 up to October 1, 1883, and the balance to be paid
in the purchase of 1100 or 1200 tons of rails to be charged to the
Gainesville Company at cost, all unpaid subscriptions of the
Gainesville Company to be turned over to the Georgia Company to
be used in the construction of the road.   The stock was to be de-
posited with the cashier of the Georgia Railroad & Banking Com-
pany, to be held by him in escrow, and not to be delivered until
the fulfillment of the undertaking by the Georgia Company,
though in the meantime it was to have the right to vote the stock
as if its title were complete.   The bonds were also to be deposited

with said cashier, and to be delivered to the Georgia Company at the rate of $1,000 of bonds for $900 of the payments stipulated, but the payments were to be applied first for the payment in full of the stock, and the overplus, after the stock was fully paid for, was to be in full for the purchase of the bonds.    On each of the $161,500 of bonds the Georgia Company placed a written indorsement, guaranteeing the prompt payment of the principal and interest thereof, and agreeing to appropriate thereto the income from $250,000 of Atlanta & West Point debentures, which accrued to the Georgia Company during the continuance of its ninety-nine year lease of the Georgia Railroad & Banking Company.

It appeared that the City of Gainesville, as a stockholder of 'the Gainesville Company, filed a bill, in 1884, attacking the contract of March 31, 1883.    In this case (which was dismissed without a hearing) the Gainesville Company filed an answer which contained the following statement: "Defendant . . had failed to get the stock subscribed, and had for eighteen months vainly endeavored to negotiate any more bonds beyond the $83,000 originally sold at a discount of $12,350. Its floating debt had become urgent, the interest on its bonded debt accruing, and it had to choose between raising money by lawful means on the one hand, or abandoning its enterprise and losing all investments made on the other.    After most strenuous efforts, defendant found it could not have the stock subscribed for without offering special inducements to subscribers, nor could it dispose of its bonds except in connection with a controlling interest in the stock, nor would any prudent purchaser take the stock except as fully paid up."    Under these circumstances the defendant negotiated with its codefendant Green (who was the general manager of the Georgia Company), and the outcome was the contract for the sale of the stock and bonds.    In this same suit of the City of Gainesville the Georgia Railroad Company, by Green, general manager, also filed an answer containing the following statement: "As a part of the transaction in which this defendant paid to its codefendant $145,-350, and received from it 2,600 shares of stock fully paid up, and $161,500 face value of bonds, was the understanding on the part of this defendant, not expressed in the instrument of March 31, 1883, but implied from the nature and necessity of the case, and since steadily acted on, that this defendant would go on and

complete codefendant's railroad, and equip it, without any refer-
ence to the question whether the resale of the bonds would fur-
nish enough money for the purpose or not. It has been in pursu-
ance of such implied undertaking of this defendant that the sum
of $92,600 has already been expended, and the further sum of
$15,000, or more if needed, will be expended." $161,500 of
bonds at 90 amount to $145,350, the contract price for stock and
bonds set out in the contract of March 31, 1883. In a letter
dated May 12, 1883, from John M. Green, general manager of
the Georgia Railroad & Banking Co., who signed the contract, to
T. M. Cunningham, cashier of the Central Railroad & Banking Co.,
then one of the lessees of the Georgia Railroad Company, appears
the following as indicative that the Georgia Railroad & Banking
Company considered that it was paying 90 for the bonds: "We
have acquired $66,000 par value of bonds of the G., J. & S. R.
R.; cost of same $59,400."

A. D. Candler, president of the Gainesville Company, testified
before the auditor, that the reasons which "led me to sell the
stock and bonds to the Georgia Railroad were, I was trying to
build to a connection with it in order to secure Gainesville the
benefit of competition in freight. I only had $70,000 to begin
with, and expended that and issued a first mortgage for $245,000.
The broker sold $85,000 of these unindorsed. I put that in the
construction of the road, and could go no further. The company
owed $40,000, with nothing to pay it. I tried to effect some ar-
rangements with the Central, and could not do so, and it was
suggested that I see the Georgia Road, and this arrangement was
made with it. I could not find anybody who would furnish the
money to complete the road, unless I gave with the bonds a con-
trolling amount of the stock. The contract was all one transac-
tion with the Georgia, and the bonds and stock were sold together,
and that is what I meant by calling it a 'lumping trade.' The
arrangement was called to the attention of the Gainesville Com-
pany and ratified before the stock was transferred, so as to make
the Georgia a majority stockholder. At that time 15 miles of
the road was finished, 23 1/2 miles graded; we had on hand, for
which we were indebted, rails for 14 miles, and had 15 miles still
to grade. There was a branch road which was partially com-
pleted. Every dollar of the money was used in completing the

road.   It could not have been completed without it, and we could get it from nobody else.·  The lessees also guaranteed to Gainesville rates of freight from the east and west as favorable as Athens and Atlanta enjoyed.     That was a verbal understanding between myself and Major Green, at the time the transaction was had.     The completion of the road resulted at once in decreasing the rates to Gainesville.     Rates of freight have been lower ever since."     None of the holders of the $161,500 "indorsed" bonds were parties to the present suit, except as represented by the trustees named in the mortgage.   The Georgia Railroad Company, being the majority stockholder, elected its own general manager as president of the Gainesville Company, and proceeded to complete the road to Monroe, where it connected with the Walton Railroad which was a narrow-gauge road.     In 1884 the Walton Railroad was consolidated with the Gainesville Company, its gauge being made standard and the entire road from Social Circle through Monroe to Gainesville was operated through officers elected by the Georgia Railroad Company.     The $145,000 stipulated in the contract not being sufficient to equip the Gainesville Railroad, the Georgia Railroad Company advanced further sums, issuing a second mortgage of $75,000, taking the bonds thus secured at par; and the management of the road not being successful and not earning the interest on the bonds, the Georgia Company from year to year advanced additional sums on said operating and interest account, which at the time of the hearing amounted to $365,000, and for which the auditor rendered judgment in favor of the Georgia Company.   On February 15, 1897, the Georgia Railroad Company notified the Gainesville Company that the earnings of the latter company had been insufficient to pay its operating expenses and fixed charges; that the annual deficit had been met by advances made by the Georgia Railroad, which was the majority stockholder; and that, after March 15, 1897, the Georgia Railroad Company would decline to make further advances, and the Gainesville Company must look to its own earnings to meet its obligations.

In the petition to foreclose, filed by Alexander, holding unindorsed ·bonds under the first mortgage, he prayed that the bonds held by petitioner and other holders of bonds secured by said mortgage be decreed to be a valid and binding debt of the com-

pany to the amount of the principal and interest thereof, and be
secured by and entitled to the security of the said mortgage. In
its answer the company raised no issue as to the validity of the
bonds secured by the mortgage, but, in reply to the charge of
waste and mismanagement, stated that the 2,600 shares of stock
of the par value of $130,000, and $161,500 of the bonds, had
been already sold to the Georgia Railroad Company "in a lump-
ing trade," for the purpose of completing the road to Monroe in
Walton county. In the bill brought by Brown, Barnes, and Phin-
izy, trustees under the mortgage, they also prayed that the mort-
gage be foreclosed and the proceeds be prorated with the several
bondholders upon their several bonds, and, having alleged that
the Georgia Company had been in the management of the prop-
erty, made the Georgia Company a party defendant, and prayed
that it be made to account for its management of the road and
for the income and property over all securities received by it.
The Gainesville Company answered, adopting the answer already
filed in the Alexander case. The Georgia Company likewise an-
swered, admitting its willingness to account, averring that while it
was a majority stockholder, and had control of the election of
officers, it had in no other way operated the Gainesville road, but
set up that it had paid the interest on the bonds and supplied the
deficiency, and that the annual deficit arising from the operation
of the Gainesville road had been met by advances made to it by
the Georgia Railroad Company as majority stockholder. The in-
tervention of Weed and other holders of unindorsed bonds to the
amount of $83,500 recited the filing of the two suits to fore-
close, and asked to be made parties so as to enforce their rights
as such bondholders and creditors of the Gainesville Company,
"the rights of petitioner being different from, and in some re-
spects antagonistic to, other bondholders secured by the mort-
gage." They prayed that the receiver be instructed to institute
an action against the several directors personally, who entered
into and carried out the transaction with the Georgia Railroad
Company, March 31, 1883, which is set out in the answer of the
railroad company to have been a lumping trade of $161,500
of bonds, with $130,000 of common stock of the company, for
$145,350, thereby aiding in diverting the property of the cor-
poration to the injury of these intervenors as creditors, and had

with a company which had no right to enter into any such contract to acquire the control and become the owner of the majority of the stock of the railroad company; that the auditor be required, in marshaling the assets, to ascertain all the facts, and particularly the character of the contract of March 31, 1883; and that the same, if found illegal, be declared to be null, unconstitutional, and void, and the Georgia Railroad Company be required to account for and pay over all the property which came into its hands under and by virtue thereof. No proceedings were ever begun against the directors. This intervention was allowed on April 2, 1897. On the same day the suits by Alexander and by the trustees were consolidated and ordered to proceed as one case.

By an amendment filed June 3, 1897, Weed and his cointervenors recited the sale to the Georgia Company of 2,600 shares of stock, and $161,500 of first mortgage bonds; that after receipt of the bonds the Georgia Company guaranteed the same, and afterwards sold the same above par; and the subsequent consolidation of the Gainesville Company and the Walton Company. This intervention was referred to the auditor, with liberty to the Georgia Company to amend its pleadings in answer thereto. Thereafter Alexander as a bondholder and the trustees under the mortgage, petitioners in the consolidated cases, reciting the contract by which the Georgia Railroad Company had purchased the bonds and stock, alleged that the Georgia Company had complete dominion and control of the railroad, had wasted and mismanaged its property, and had purchased from the Gainesville Company certain locomotives and cars subject to the lien of the mortgage; and prayed that the Georgia Railroad be required to account for the amount of assets and interest coupons received without adequate consideration as aforesaid, and to account for the earnings of the Gainesville Company, that the sale of the rolling-stock be set aside, and that the rent of all the rolling-stock be charged against the Georgia Railroad Company. The Georgia Company answered the original petition, amendments, and intervention; admitted making the contract; averred that it was in good faith, for full value, and in the interest of the Gainesville Company; denied that it had operated the road, but alleged that the operation had been by the officers of the Gainesvillle Company, who had been elected by it as a majority stockholder; and denied all waste and mis-

management, but on the contrary alleged that the same had been to the best interest of the company, and with results far better than could have been secured in any other way.    It denied that there had been any discrimination against the Gainesville Company; and alleged that while rolling-stock had been transferred in payment of advances made, it had never been off the line of the Gainesville Company, and had been constantly for its benefit.    It averred that a deficit of $362,000 had been met by advances made by the Georgia Company, for which it prayed judgment. Thereafter Brown, Phinizy, and Barnes, trustees under the second mortgage to secure $75,000 of the bonds, intervened and prayed for a foreclosure of such second mortgage.    Subsequently the original petitioners averred the consolidation with the Walton Railroad, and claimed that the lien of their mortgage extended thereto as after-acquired property of the Gainesville Company; averred that the road could not be sold in sections without irreparable damage; asked for a sale of the entire line, and that the property be administered as a whole, and, when sold, that the proceeds be distributed between the creditors and bondholders of the two companies in proportion of their respective claims.    Subsequently certain stockholders of the Gainesville Company intervened and attacked the validity of the sale of the stock and bonds to the Georgia Company, and prayed that the bonded indebtedness of the company be reduced to the true amount for which said company is legally bound and equitably liable.    The Gainesville Company amended its answer, alleging that the open account indebtedness to the Georgia Railroad Company was barred by the statute of limitations

After the report of the auditor, and before it was recommitted, the City of Gainesville, as a stockholder owning $50,000 of the capital stock of the Gainesville Company, intervened and attacked the sale of the bonds to the Georgia Company as having been usurious, and for a grossly inadequate sum; that bonds to the amount of $161,500 were sold to various parties to intervenors unknown, and they were represented by the trustees; that it would be inequitable and illegal to allow the usurious bonds to be collected or to allow a judgment therefor; that the Gainesville Company is not attacking the transaction as usurious, although intervenor has called upon and demanded of the officers that they

should so attack the same. It prays that the trust deed be set aside for usury, that the bonds secured thereby be declared usurious; that the sale of bonds and stock to the Georgia Company be declared illegal · that the bonds be purged of usury, and the trustees of the bondholders be not allowed to collect more than the amount actually paid for the bonds, with interest at seven per cent. The Gainesville Railroad Company thereupon abandoned its former position that the sale was a lumping trade, and pleaded usury. This intervention and the amendment of the city were met by answer of the Georgia Company, setting up the same facts substantially as set out in its former answers, and further averring that " any right to recover any usurious payments from this defendant or the bondholders has long since been barred by the statute of limitations."

The auditor, H. H. Perry, filed a report in which he found: " (11) That, under and in pursuance of the contract of March 31, 1883, the G., J. & S. R. R. Co. sold to the Ga. R. R. Co. bonds of the first-mentioned road, amounting to $161,500, for the sum of $15,350, and said bonds were delivered to the Ga. R. R. Co., and said sum of $15,350 paid therefor to the G., J. & S. R. R. Co. (12) I find that at the time of the above sale the Ga. R. R. Co. was not a stockholder of the G., J. & S. R. R. Co. (13) I find that the foregoing sale was duly authorized by the directors of the G., J. & S. R. R. Co., by resolution of March 17, 1883. (14) I find that, in said transaction by which the G., J. & S. R. R. Co. transferred to the Ga. R. R. Co. the aforesaid bonds, there was no intention on the part of either company of the contracting companies to evade the usury laws, and that the same was not a device to evade said laws. (15) I find that the aforesaid transaction did not contemplate, and was not in contemplation of law, a loan by the Ga. R. R. Co. to the G., J. & S. R. R. Co. of the sum of $15,350, or any other sum, but a sale of its bonds as authorized by the Acts of 1881, page 242, approved Aug. 4, 1881. (16) I find that said bonds, after the same were sold to the Ga. R. R. Co., were by it put on the market and sold to various parties, and that those who now hold said bonds are bona fide holders for value. (17) I find as a matter of law that there was no usury in the transaction aforesaid, under and by virtue of which said title to said bonds was obtained. (18) I find further as a matter of law

that the trustee for the bondholders is entitled to recover the full face value of said bonds, and interest thereon, in the decree of foreclosure for the benefit of said bonds as heretofore found. (19) I find as a matter of law that no part of the account of the Ga. R. R. Co. against the G., J. & S. R. R. Co., for payment of coupons on the aforesaid bonds for the G., J. & S. R. R. Co., up to the time of the appointment of the receiver, should be diminished on the grounds of usury. (20) I find as a matter of fact that the aforesaid payments of said coupons were made by said Ga. R. R. Co. with an understanding between said companies that said Ga. R. R. Co. should pay said coupons as they fell due, and charge said payment to the account of the G., J. & S. R. R. Co., and that no notice was ever given by the said G., J. & S. R. R. Co. to the Ga. R. R. Co., up to the time of said payment or payments, of any intention to set up the defense of usury. (21) I find, therefore, as a matter of law, that even if there had been usury in the original transaction, the said G., J. & S. R. R. Co. can not now set up the question of usury as a defense to the repayment of said amounts to the Ga. R. R. Co.

" I recognize it as a correct principle of law, that, in the case of an ordinary note or bond between private parties, and perhaps private corporations strictly so called, one can not sell his own note to another at a discount and evade the usury laws. The law will consider the transaction a loan; and if the discount is sufficient to make the ultimate sum to be paid amount to more than the sum received, with legal interest added for the time the note or bond is to run, it will be usury. But there is a distinction between transactions of this kind and the sale of public securities such as the bonds of municipalities, counties, railroads, and other quasi-public corporations. It grows out of the character which modern usage has stamped upon such bonds. Bonds of this kind were not negotiable at common law, but their negotiable character was acquired by custom and usage, and recognized by the courts by a long course of decisions. The same usage and customs have given such securities the character of chattels. They are in reality a species of property, and not merely choses in action. As said by Justice Miller in an opinion in a case in the Supreme Court of the United States, one half of the wealth of the country is invested in government and corporation bonds. Such bonds, as

in this case, are usually made payable to bearer, and are intended to and do pass from hand to hand. A number of States have enacted laws prohibiting the defense of usury to corporation bonds. These statutes are based upon the existence of a distinction between such bonds and ordinary private loans. But the distinction exists in principle, and arises from the fact that universal custom and usage have given them the character of chattels. Their wide-spread circulation, the manner in which they pass by delivery from hand to hand, give them also a similitude to bank notes. The same sound reason which would forbid the defense of usury to bank notes would apply in a large measure to such bonds. To put upon each purchaser the duty of inquiry as to the original consideration received would destroy their utility. In this case the pleadings in no case speak of the transaction in which the Ga. R. R. Co. received these bonds as a loan, but always as a sale. The statute authorizing their issue authorizes the company to issue and sell their bonds. Thus the language used bears witness to the character of such transactions. Certainly, in the hands of bona fide holders for value, the defense of usury should not avail in the case of such securities. I will content myself with referring to the reasoning of the court in 35 Iowa, 143, which is based upon principle and not upon statute, and refer also to the following authorities: 21 Howard, 414; 27 Am. & Eng. Enc. L. (1st ed.) 1029; 1 Stockton's Ch. (N. J.) 698; 120 U. S. 287; 15 Gray (Mass.), 182–3; City of Memphis v. Brown, 11 Am. L. T. 424; 6 West Jur. 495; Memphis v. Ballard, 17 S. W. 191; 85 Tex. 520, 550; 96 N. C. 298; 21 Howard, 575.

". . . If there was no express contract, [the Georgia Company] was virtually compelled to make large additional advancements in order to complete the road, amounting at the beginning to between $70,000 and $80,000, and did advance, to keep up the road and to keep up its credit, sometimes during long periods of depression, all told, over $365,000, for which it has nothing to show except an open account of very doubtful value, in addition to the amount originally paid for stock and bonds. In view of this, it can hardly be said that the directors acted unwisely or to the real injury of any one interested in the road, either as a stockholder or bondholder. I do not think there is any reason why the transaction should now be set aside. It might almost, with propriety,

be said that the Ga. R. R. Co. practically occupied the position of a construction company in acquiring these bonds. (23) I find specially that as to the G., J. &. S. R. R. Co., the only party in this case setting up usury in the aforesaid transaction, that the $161,-500 par value of bonds together with the 2,600 shares of the common stock of said company was sold by said company to the lessees of the Ga. R. R. Co., on March 31, 1883, for $145,350, in a lumping trade (the company having so alleged in its answer in this case, filed April 1, 1897). . . (24) That the amount of capital stock of the G., J. & S. R. R. Co., as authorized by its charter, to wit $250,000, was never fully subscribed for, nor scrip issued therefor, until pursuant to the contract of March 31, 1883, with the Ga. R. R. Co., when all unpaid subscriptions to the capital stock already subscribed for, and all subscriptions thereafter obtained to the capital stock, were agreed to be turned over to the lessees of the Ga. R. R. and Banking Co., to be used in the construction of the road."

To the auditor's final report the City of Gainesville excepted on the ground that the purchase of the $161,350 of the first-mortgage bonds of the Gainesville Company was usurious. After argument, and after the court had announced that it would hold that the transaction was usurious, but before the decree was signed, the City of Gainesville dismissed its exception. Weed and the other holders of unindorsed bonds, amounting to $83,000, also filed exceptions to the auditor's report, but, while attacking the legality of the contract between the Gainesville Company and the Georgia Company, did not except to so much of the auditor's report as held that the contract by which the stock and bonds had been conveyed to the Georgia Company was free from usury; though they did object to the court allowing the City of Gainesville to dismiss its exceptions to the finding that the sale of the bonds was free from usury. By final decree the court ordered the sale of the property, fixing $3,000 a mile as the upset price. The only parties plaintiff in error are the holders of the $83,000 unindorsed bonds, who assign error on the decree as a whole, and on the failure of the judge to sustain their exceptions to findings of fact and rulings of law made by the auditor.

*Frank H. Miller* and *W. A. Charters,* for plaintiffs in error.
*Joseph B. & Bryan Cumming, W. I. Pike, H. H. Dean, E. T.*

*Brown, A. S. Erwin, W. K. Miller, W. H. Barrett, Bowdre Phinizy,* and *H. A. Alexander,* contra.

LAMAR, J. (after stating the foregoing facts.) The Gainesville, Jefferson and Southern Railroad Company was authorized to issue $250,000 of stock and $245,000 of first-mortgage bonds. It obtained subscriptions for $120,000 of stock, and sold $83,500 of bonds. With the proceeds it constructed about one half of its road. Its funds being then exhausted, and it being unable to sell the remaining bonds or to secure subscriptions to the balance of the capital stock, its officers were advised to interest the lessees of the Georgia Railroad in the completion of the work. After many negotiations a contract was made, March 31, 1883, by which, in consideration of $145,350 to be paid in installments, it sold to the Georgia Railroad Company $130,000 of the Gainesville Company's capital stock "fully paid up," and $161,500 first-mortgage bonds to be left with a depositary until performance of the undertakings by the Georgia Railroad Company, but bonds to be delivered at the rate of $1,000 of bonds for $900 cash paid, "the payments to be applied first in payment in full of the stock and the overplus to be in full for the bonds." On the $161,500 bonds thus acquired the Georgia Railroad Company placed an indorsement guaranteeing the payment of the principal and interest. Thus indorsed they were sold in open market. By virtue of the ownership of $130,000 of capital stock the Georgia Company elected the officers of the Gainesville Company and proceeded to build the road, advancing $107,000, in addition to the purchase-price under the contract of March 31, 1883. During the fifteen years of its management the Georgia Company made advances aggregating $365,000, much of which went to pay the coupons on the mortgage bonds. Default was made in 1897. There were two bills, one by a bondholder and one by the trustees, to foreclose the first mortgage on the Gainesville road; another to foreclose the second mortgage; and still another to foreclose a mortgage of the Walton road, which had been merged with the Gainesville Company. These four cases were consolidated. There were interventions by a stockholder, and by the holders of $83,500 of unindorsed bonds, contending that the purchase of the majority of the Gainesville stock by the Georgia Company was ultra vires, and in restraint of trade; attacking the contract of March 31, 1883; and

claiming that the present owners of the $161,500 bonds sold thereunder to the Georgia Company at less than par were not entitled to share equally in the proceeds of the sale of the mortgaged property. The Georgia Company was made a defendant, and there were prayers that it should account for its management of the Gainesville road, and for all profits made by it on a resale of the bonds bought at 10 and resold at 105; and for general relief. The Georgia Company answered, and filed a counter-claim for $365,000 against the Gainesville Company. There was an immense mass of evidence, a report by the auditor, a recommittal, another report, and many exceptions. This resulted in a record exceedingly voluminous. The court overruled all the exceptions to the auditor's report, and decreed that the road be sold, and that all the bonds should share equally in the proceeds. The holders of the $83,500 of unindorsed bonds filed a bill of exceptions to this court. The assignments of error may be so grouped as to somewhat shorten what would otherwise be an exceedingly lengthy opinion. All those in reference to the allowance for fees for the receiver and attorneys were abandoned. Those relating to exceptions to the auditor's findings of fact are sufficiently dealt with in the headnotes. Civil Code, §§ 4594, 4595, 4596, 5876.

The construction of the Gainesville Railroad did not lessen or increase, but created competition where none previously existed. But if the geographical situation or character of business transacted had made the Georgia and the Gainesville competing roads, the State, the stockholders, or the parties alone could have attacked the contract of March 31, 1883, as being ultra vires, or in restraint of trade. Bondholders are not authorized to act as guardians for the public or the parties, in having such a contract set aside or declared to have been illegal; certainly not in a case where the bondholder prays that the subscriber to the stock under such contract be held liable for the unpaid subscription. Civil Code, §§ 5800, 3668. The trustees under the mortgage represent all of the bondholders. And where bondholders are allowed to intervene pro interesse suo, the death of one of a class will not cause the suit to abate, nor will it be necessary to have the representative bondholder made a party, her interest being represented by the trustee and the other bondholders making the same contention as that on which she relies. The fact that the trustee repre-

sented all bondholders also makes it unnecessary for the bonds to be proved before final decree of foreclosure.    Here all the pleadings admitted that the entire issue of bonds had been sold; and if any question as to ownership is raised, the court can frame an order to have the same determined by reference to a master, and by proper provision in the order of distribution.  Civil Code, §§ 4842, 4853, 4856.

The holders of the $83,500 unindorsed bonds insist that, on the doctrine of two funds, those holding the $161,500 of bonds indorsed by the Georgia Company, and the indorsement secured by the pledge of Atlanta & West Point stock, should be required to exhaust this source of payment before being allowed to participate in the proceeds of the sale of the mortgaged property.    But the indorsement was not a lien, and was not equally accessible. The indorsement was not a liability, and the collateral was not the property of a common debtor.  In no sense does the case come within the provisions of the Civil Code, § 2691, that "a creditor having a lien on two funds of the debtor, equally accessible to him, will be compelled to pursue the one on which other creditors have no lien."

The main contentions relate to the attack on the contract of March 31, 1883, which recited that the Gainesville Company sold to the Georgia Company $161,500 of bonds, and $130,000 of fully paid-up stock for $145,350, payable in installments; the stock and bonds to be deposited in escrow and the Georgia Company to receive $1,000 in bonds for every $900 in cash paid; but the installments to be applied first to the payment of fully paid-up stock, and the balance to be in full payment for the bonds.    There was no objection to the introduction of parol evidence seeking to show that the paper did not set forth the real consideration; and the holders of the unindorsed bonds, amounting to $83,500, insisted (a) that this was a sale of bonds at 90 with the stock as a bonus, and that therefore the Georgia Railroad Company was liable as for an unpaid subscription of $130,000.  (b)  The City of Gainesville, an intervening stockholder, insisted that it was a sale of stock at par, and of bonds at ten cents on the dollar, in consequence of which the bonds were infected with usury.  (c)  The Gainesville Company in its original answer contended that the stock and bonds had been sold in a "lumping trade," and the

Georgia Company, uniting in this line of defense, also insisted (*d*) that the sale was made to it as a construction company, on the further agreement that it was to advance what other sum might be needed to complete the road; that it had actually advanced $107,000 additional, besides complying with its agreement to reduce freight rates.    The uncontradicted evidence may probably have been sufficient to have a finding on this last theory.    But the auditor found that it was a sale of stock at par, and of $161,500 of bonds at ten cents on the dollar.    For the reasons set out in his report he held that this transaction was not usurious, because the law applicable to loans on ordinary paper did not apply to a sale of corporate bonds.    The City of Gainesville excepted to this ruling, and, over the objections of the intervening bondholders, withdrew the exceptions before the decree.    As to which we hold that where there are various and independent parties to the litigation, and one files exceptions, the others have no vested interest therein; that the exceptions may be withdrawn, and other parties to the record can not complain of the dismissal, or use the original exceptions as a basis for the assignment of error here.    Civil Code, §§ 4845, 4903.    The case might be different if the trustees or other representatives of parties who had intervened had filed an exception, and his beneficiaries had relied thereon and failed on that account to make an independent exception. But here there was no such relation between the intervening bondholders and those who originally complained of the auditor's finding on the subject of usury.

It is not necessary to elaborate the proposition that if the contract of March 31, 1883, should be construed as a sale of bonds at 90 and the stock as a bonus, there was no usury.    If so, then nothing which thereafter occurred rendered invalid that which was valid in its inception.    If the Georgia Railroad Company improperly included the $107,000 advanced by it as a construction company as an item in the set-off, or if it took second-mortgage bonds for a part thereof, this might affect that company's right under the second mortgage, and it might reduce the amount of the judgment to which it was entitled on the set-off; but it could not be effective to invalidate bonds now in the hands of innocent third persons.    If the contract was a sale of bonds at 90 and the stock was a bonus, the liability on the unpaid subscription was

barred in six years. *Georgia Manufacturing Co.* v. *Amis*, 53 *Ga.* 228. But whether barred or not would be immaterial to the plaintiffs in error, because a liability of $130,000 would not exhaust, but only reduce, the judgment for set-off of $365,000. Or, if the Georgia Company was liable on its stock subscription of $130,000, for the profit made on the resale of the bonds, for the $75,000 secured by the second mortgage, for waste and mismanagement or other act done by it as a majority stockholder; and if it be conceded that such claims are not barred ; and if the intervening bondholders, as creditors, had the right to enforce such cause of action; and if the pleadings warranted a judgment on any or all of these claims, yet it appears that the Georgia Company has a claim for $365,000 cash advanced to the Gainesville Company, much of which went to pay the coupons including those held by the complaining intervenors. And unless the claims against the Georgia Company exceeded the amount of the set-off, the plaintiffs in error have no cause to complain, since they must be paid in full on their first lien before the Georgia Company can get anything on the judgment for $365,000.

The auditor, however, did not predicate his finding that there was no usury upon the idea that the Georgia Company as a construction company had advanced a sum sufficient to remove any taint of usury. Nor did he sustain the contention of the plaintiff in error that the bonds had been sold at 90, with the stock as a bonus ; but he put his decision squarely on the proposition that a corporation may lawfully sell its bonds at a discount greater than eight per cent. If this question were one between the Georgia Company and the Gainesville Company, the original parties to the transaction, we would be called upon to determine the point. But these bonds are in the hands of innocent third persons, who purchased the same at 105 from the Georgia Railroad Company; and the contest is between bondholders over the proceeds of the road. The majority of the court are of the opinion that the question of usury and the effect thereof is not presented by any of the assignments of the plaintiff in error. The writer is of the opinion that it is presented, because of the assignment on the court's ruling that all of the bonds should share equally, and yet the result would not be changed. And, speaking for myself and not for the court, whether there was usury or no usury in the original sale of

the bonds, subsequent bona fide holders before the bonds were due, without notice of any usury, are all entitled to share alike out of the property mortgaged to secure the entire issue.    All of the decisions in this State apparently to the contrary are predicated upon *Daly* v. *Lumpkin*, 1 *Ga.* 407.    But that case is in perfect harmony with the uniform current of authorities, being put, as it was, upon the express language of the act of 1829 (Cobb's Dig. 393), which declared that any note or bond infected with usury was void both as to the usury and legal interest.    The bona fide holder of a negotiable instrument is protected from the defense of usury, since the present statute not only does not make such contract void, but section 3694 requires both an "illegal and immoral consideration" in order to affect such paper in the hands of an innocent purchaser.    Contracts to pay usury are unlawful, but only as to the usurious interest; but mere illegality in the consideration is not sufficient to defeat the right of an innocent holder.    In *Rhodes* v. *Beall*, 73 *Ga.* 641, the common-law authorities were recognized, but the court there, in considering a contract which by act of Congress was even declared void, said: "The statute which makes such contract illegal and void must also make the same a crime, or the act itself must be immoral and contra bonos mores, to affect the bona fide holder of negotiable paper." "A contract may be illegal without being immoral; but the consideration, to make the defense available, must be both immoral and illegal." *Perkins* v. *Rowland*, 69 *Ga.* 664.

Many courts in construing the statute of usury have recognized that if the instrument thus infected is declared to be void, it obtains no validity by being transferred to an innocent third person. If the contract is merely declared to be unlawful or illegal, and the act is not made a crime, then an innocent purchaser takes the same free from the defense of usury.    Thus Judge Story in Fleekner *v.* United States Bank, 8 Wheat 338, says, "The statutes of usury of the States, as well as of England, contain an express provision that usurious contracts shall be utterly void; and without such an enactment, the contract would be valid, at least in respect to persons who are strangers to the usury."    And in Converse *v.* Foster, 32 Vt. 828, cited and followed in the carefully considered case of Lynchburg National Bank *v.* Scott, 91 Va. 656, it was held that: "The English statute against usury . . not

only imposes a penalty for such illegal act, but expressly declares that all notes, bonds, and other securities given for such illegal consideration shall be utterly void. All the cases . . turn upon this very distinction and difference between the statutes. In those cases in which the legislature has declared that the illegality of the contract or consideration shall make the security void, the defendant may insist on such illegality, though the plaintiff took the same bona fide and gave a valuable consideration for it. But unless it has been so expressly declared by the legislature, illegality of consideration would be no defense to an action at the suit of a bona fide holder for value, without notice of the illegality." See, to the same effect, Webb on Usury, § 159, and authorities cited.

The law is opposed to usury, but it favors bona fide holders of negotiable paper. In protecting such innocent holders, it is not considering solely the rights of the respective parties to the litigation, but serving public policy to protect the innocent purchaser on the one hand, and on the other to enable owners of a valid paper to sell the same without the delay which would be inevitable if the purchaser in each instance were required to make an investigation of the consideration on which the negotiable instrument issued. If there is no consideration whatever, and the paper thereafter comes into the hands of an innocent purchaser, he would be entitled to recover the face value. Why, then, should it be that he would be liable if he received nothing, and not liable when he received something, unless that something was both illegal and immoral, and therefore by statute unenforceable? Bonds like these are now universally held to be negotiable, and pass by delivery. As in the present instance, they may be sold by the company to one purchaser at one price, and to another at another price. Or, as appears here, they may be held in this country and in Europe. To require each separate purchaser at the point of issue, or at a distance, to make an independent investigation as to the consideration for which each separate bond was originally put upon the market, would be to establish a rule which, if it did not absolutely prevent the sale of such security, would disastrously affect a borrower's rights to use his credit. A subsequent purchaser would have to make the investigation where the bonds were issued at par, as well as when they were sold at a usurious rate. The innocent borrower would thus suffer with the guilty.

Consequently, and in pursuance of an imperative public policy, many States, whose statutes would admit of such a defense against ordinary negotiable paper, have enacted provisions preventing corporations from setting up the defense of usury when sued on corporate bonds. Others have declared by statute that the plea of usury should not be available against a bona fide holder of negotiable paper. Other courts, without statute, have declared that this defense is not available in a suit on bonds. Others (Junction R. Co. *v.* Bank of Ashland, 12 Wall. 226) have preserved this policy by holding that a sale of bonds was not a loan. Contra, Schermerhorn *v.* Talmann, 14 N. Y. 93. And our statute (Civil Code, § 3694) has prevented such defense against bona fide purchasers, by declaring that illegality of consideration shall not prejudice a bona fide holder of negotiable instruments, unless the consideration is both illegal and immoral.

Cited by plaintiffs in error. Purchase of stock ultra vires: *Collins* v. *Central R. Co.*, 40 *Ga.* 582; Nashville R. Co. *v.* Kentucky, 161 U. S. 677; 101 U. S. 71; 130 U. S. 1; 118 U. S. 290; 139 U. S. 24. Right of bondholders to sue: Cook on Corp. §§ 735, 816; *Fouché* v. *Merchants Bank*, 110 *Ga.* 839; 2 Elliott on R. §§ 378–9; 146 U. S. 631; 88 *Ga.* 471. Competition: Thomas *v.* Railroad Co., 101 U. S. 71, 82; Branch *v.* Jessup, 106 U. S. 468, 478; Pennsylvania R. Co. *v.* Pullman Palace Car Co., 139 U. S. 24, 48; Civil Code, § 2983; 85 *Ga.* 348; 88 *Ga.* 702; *Guilmartin* v. *Middle Ga. R. Co.*, 101 *Ga.* 570; *Wilkinson* v. *Bertock*, 111 *Ga.* 187. Two funds: Citations supra, and 110 *Ga.* 697; 101 U. S. 292.

Cited by defendants in error. Embarrassed corporation may sell stock at less than par: Cook on Stock (3d ed.), 58; Vancolt *v.* Vanbrunt, 82 N. Y. 535; Clark *v.* Bever, 139 U. S. 96; Coit *v.* Gold Co., 119 U. S. 342; Handley *v.* Stultz, 139 U. S. 417; Morrow *v.* Nashville Co., 87 Tenn. 262; Railroad Co. *v.* Dow, 120 U. S. 287; Stein *v.* Howard, 65 Cal. 616. Two funds: Civil Code, § 2691; *Carter* v. *Neal*, 24 *Ga.* 346; *Vance* v. *Roberts*, 86 *Ga.* 457.

*Judgment affirmed. All the Justices concur, except Simmons, C. J., absent.*