NORTHERN TRUST CO. et al. v. COLUMBIA STRAW–PAPER CO. et al.

(Circuit Court, N. D. Illinois.   July 7, 1896.)

1. CORPORATE STOCK—UNPAID SUBSCRIPTION.

S., the owner of certain mills, transferred them to a company in exchange for its first mortgage bonds and substantially all its stock, without any objection on the part of the stockholders.   Thereafter the bonds were sold by S. to other persons, who received stock from him as a bonus. *Held*, that such persons could not, on the petition of other stockholders, be charged with any sum as being unpaid upon their stock.

2. FORECLOSURE—PRODUCTION OF BONDS.

In a suit to foreclose a trust deed, the bonds need not be produced till a decree of foreclosure is rendered.

Bill by the. Northern Trust Company and another against the Columbia Straw-Paper Company and others.   On exceptions by one Dickerman and others to the master's report.

Bonds were issued by the Columbia Straw-Paper Company under a deed of trust made to the Northern Trust Company and another, and were delivered by the company, together with a large quantity of its stock, to one Stein, in exchange for certain mill plants and cash. Stein sold the bonds at their par value, giving part of the stock to the purchasers as a bonus. Thereafter foreclosure proceedings under the mortgage were instituted, and it was sought by certain stockholders to have certain of the bondholders charged with amounts alleged to be unpaid on the stock received by such bondholders as a bonus.

Dupee, Judah, Willard & Wolf, for complainants.

Herrick, Allen, Boyesen & Martin, for defendant Columbia Straw-Paper Co.

John S. Cooper and Otto Gresham, for remaining defendants.

SHOWALTER, Circuit Judge.   In this case the defendant corporation contracted with Stein, whereby, for certain specified properties, which he caused to be transferred to that company, all or nearly all of the stock of that company was exchanged. Stein afterwards delivered, or caused to be delivered, it is said, a large portion of this stock to third parties.   There was no express agreement by these parties to pay anything to the Columbia Straw-Paper Company in the way of a stock subscription.   If the complaint of these defendants be well founded, it would simply mean either that the stock should be turned back to Stein or to the company for their benefit, or treated as void.   There is no basis in this case for any ruling that the holders of the stock referred to sustained the relation of debtor to the Columbia Straw-Paper Company for the price of that stock.   This is not a case where a stock liability was incurred by certain persons, and afterwards gotten rid of in some way without payment. It might be possible to say in this case that certain of the persons to whom Stein delivered the stock were not entitled to it, as against the rights of other persons to whom he delivered other portions of stock, but there is no basis here for declaring an indebtedness by these stockholders to the Columbia Straw-Paper Company.   The Columbia Straw-Paper Company parted with its capital stock for what was agreed to be the value of that stock.   The property which Stein contracted to give, and which he did give, or caused to be

given, to the Columbia Straw-Paper Company, was what that company agreed to accept for its stock. In that transaction the Columbia Straw-Paper Company was in no way wronged. It can have no action to recover on the theory that the stock has not been paid for, nor can any discontented stockholder assert such a right for the Columbia Straw-Paper Company as against any other stockholder. A quarrel between stockholders concerning the beneficial ownership of stock which has been paid for is one thing. A controversy between a corporation and a stockholder who has not paid such corporation what is due from him for his stock, is another. The case might be different here if the rights of creditors were involved. I do not say that it would be, but under the decisions of some courts it might be.

It is strongly urged here that the property which the company got for its stock under the Stein contract was not a fair equivalent for the stock, estimating the latter at its par value. As the case has turned out, and in the light of what happened, this position is doubtless correct; but when the contract was made, and in view of the enterprise then in contemplation, I am not prepared to say that the estimate put upon the property by these parties was so far out of the way. The important point, as the case arises here, is this: Whatever may have been in fact the value of the property turned over to the company for its stock, the company agreed to take it for the stock. The persons interested were the stockholders, and there was no dissent on the part of any person concerned from what was then done. Neither any person then holding stock, nor any person who afterwards became a stockholder by assignment from one who then held stock, can now make complaint, on behalf of the corporation, as against the fairness of that transaction. This I take to be the settled law on that subject.

Much has been said in the course of the argument about looking through forms, and going to the the substance of what was done. The corporation sold its stock for a price which everybody interested at that time agreed to, and no harm was done, or wrong committed, either in law or morals. Apart from all the forms adopted by these parties in transacting the business, what the whole thing amounts to is about this: The owners of the mills, we will say, wanted additional capital to carry on their business, and desired certain capitalists to join with them and become interested. These capitalists did so, and furnished $1,000,000, upon the understanding that a certain managing agent should take the legal ownership of the mills, and that the business should be continued and carried on, and that they should have, as against the mill owners, a lien for the repayment of that money upon the mills themselves. After a time the business failed. The persons who furnished the money simply insist upon an enforcement of the lien. The cash was advanced upon this understanding, and there is no offer by the mill owners to return it. I cannot see how a foreclosure of the mortgage could be prevented, on the state of facts here. Even if the circumstances were such as to entitle the mill owners to repudiate the contract, a tender back of the money received by them as part payment for the

mills would be a necessary condition. As the case stands, I do not see how a foreclosure can be resisted, or how any set-off, as insisted on, is valid, or can be held good. .

It is alleged that the bonds were not produced before the master, and that this constitutes a fatal defect of proof. The production of these bonds was not necessary, as it seems to me, at this stage of the proceeding. The bonds were issued, and $1,000,000 was paid for them. The form of the bonds, and that they are outstanding and have not been paid, is known. Under the contract, these trustees are empowered, as it seems to me, to carry on this foreclosure proceeding, and have a decree of foreclosure, without the bonds being produced in the first instance. Toler v. Railway Co., 67 Fed. 169, appears to be in point, and to indicate the correct practice.

It is further alleged that the Flannigan judgment was obtained by collusion. It is not denied that the company owed Flannigan. It is not denied that the justice of the peace had jurisdiction, or that the judgment is valid, or that execution issued, or that it was not paid. Assuming the bona fides of the mortgage debt here, the insolvency of the company, and its inability to meet its obligation, I see nothing illegal—no collusion, in the sense of fraud—in the Flannigan judgment. The idea of collusion here is urged in connection with the other proposition, that these bondholders owed the company an indebtedness greater than the mortgage debt from the company to them; that it was inappropriate for them to seek to foreclose the mortgage, and fraudulent on the part of the company, assuming such indebtedness to it from the bondholders, not to resist foreclosure. But when one reaches the conclusion that the company was insolvent, that the indebtedness on the bonds was valid, and not subject to any offsets, and that a foreclosure was inevitable, the Flannigan judgment ceases to have any feature which would justify a court in saying that it was fraudulent and collusive in any evil sense. I think the exceptions to the master's report should be overruled.