## STEWART *et al. v.* MILLER & COMPANY INC.

1  Under the Civil Code of 1910, § 3436, no greater rate of interest than eight per centum per annum shall be reserved, charged, or taken for any loan or advance of money, either directly or indirectly by way of commission for advances, discount, exchange, or by any contract of contrivance or device whatever.

2. Under the act of 1916 (Acts 1916, p. 48), where a transaction is usurious all interest is forfeited, but no other forfeit shall be occasioned.

3. An "underwriting contract" is one to insure the sale of bonds or stock subscribed; and in case they are not sold before the installments fall due, then to purchase and pay for them at par. It is an "underwriting," and not an agreement to loan money.

4. Under the facts of this case it can not be said as matter of law that the underwriting contract was usurious.

5. In the circumstances of the case the court did not err in appointing a receiver.

Nos. 4829, 4830. FEBRUARY 26, 1926. REHEARING DENIED FEBRUARY 27, 1926.

Receivership, etc. Before Judge E. D. Thomas. Fulton superior court. March 13, 1925.

G. L. Miller & Company Inc., as trustee, brought an equitable petition against James S. Stewart and Fred P. Jeter, having for its purpose the foreclosure of a trust deed or mortgage on certain described real estate situate on 14th Street in the

---

Contracts 13 C. J. p. 320, n. 38.
Interest 33 C. J. p. 217, n. 86.
Mortgages 27 Cyc. p. 1627, n. 9.
Usury 39 Cyc. p. 1058, n. 93; p. 1089, n. 27 New.

City of Atlanta, the land having upon it an apartment-house, which was built from the proceeds of certain bonds which were secured by the trust deed or mortgage. The petition alleged certain defaults on the part of the defendants: (1) in non-payment of interest from March 1, 1924, to the date of the suit, and non-payment of the principal from July 23, 1924, the trust deed providing that the payments on the principal and interest due should be paid monthly; (2) the failure of the defendants to keep the premises insured, which the trustee under the deed of trust had done for the benefit of the bondholders at a cost of $1568.64; (3) the failure on the part of the defendants to deposit with the trustee an amount representing 4 per cent. of the interest paid, being the amount of income tax chargeable against the holders of the bonds upon the interest; (4) the failure on the part of the defendants to pay the city, State, and county taxes for the preceding year. There was a prayer for a receiver to take charge of the property pending the foreclosure of the mortgage, basing the right to receivership partly upon the contract right to have a receiver appointed, as set out in the trust deed, and partly upon the provision of the trust deed that in case of the appointment of a receiver the rents and profits should become security for the outstanding bonds, and upon the allegation in the petition that the rents, etc., from the property were being used by the defendants for purposes other than those set out above, and that none of them was being applied to the payment of the sums due under the trust deed. The defendants filed an answer to the petition, admitting some of the allegations, denying the alleged default, and averring that the indebtedness was a loan made by Miller & Co. Inc. to James A. Stewart, and that the same was usurious. The record discloses that on July 23, 1923, James A. Stewart, then the owner of the mortgaged property, entered into a written agreement with G. L. Miller & Co. Inc., the material portions of which are hereinafter set out.

In this agreement Stewart undertook to issue bonds aggregating the sum of $112,000, to be secured by a first mortgage or trust deed covering the property described in the agreement, maturing at different periods of time of about eight years, and bearing interest at 6-1/2 per cent. per annum, payable semiannually on the 23d day of January and July in each year;

and the trust deed was to be in such form and to contain such provisions as might be approved by G. L. Miller & Co. Inc., and should convey the property under warranty to a trustee to be selected by "the underwriter." In order to insure the accumulation of a sufficient sum to retire the bonds maturing in any year, the owner was to pay the trustee named in the trust deed one twelfth of the amount payable in each of the years, except the last year, on the 23d day in each month in that year, the first payment to be made on July 23, 1924. In order to create a fund sufficient to insure the prompt semi-annual payments of interest as they respectively matured, the owner agreed to pay to the trustee one twelfth of the amount of interest which would accrue in each year, on the 23d day of each month in said year in advance; and it was provided that the sum so accumulated by the trustee for the purpose of paying the bonds maturing in any year, and paying the interest coupons maturing in each year, should be applied by the trustee to the retirement of the bonds and to the payment of interest. It was further provided in said underwriting agreement that the owner would sign the bonds and coupons and trust deed, deliver possession of the bonds and coupons to the underwriter, and the trust deed or mortgage to the trustee named therein, to be placed on record, "and all the bonds with coupons attached immediately to be delivered to the underwriter, who shall have the right, power, and authority to sell or otherwise dispose of the same, when and as the underwriter desires, and any purchaser or holder of said bonds receiving the same from the underwriter bona fide for value shall be fully protected against equities and claims of any character whatsoever." The underwriter underwrites the "entire issue of bonds at the sum of $98,000, which sum, and no more, such underwriter is bound to account for to the owner in a disbursement thereof in accordance with the terms and provisions of this agreement. . . The proceeds from said bonds, less any deduction that the underwriter may be entitled to deduct therefrom under any provision of this contract, shall be used in the construction of the building upon the lands hereinbefore described, which building is three stories and basement apartment structure, containing twenty apartments; also garage to accommodate nine motor cars, and is to be constructed in accordance with the

building laws of the City of Atlanta, and in accordance with certain plans and specifications which have been agreed upon between the owner and the underwriter, and reference to which is here made. . . The name of said building shall be 'Somerset Apartments.' The underwriter shall deposit the proceeds of said bonds, as rapidly as needed, in some bank selected by it, and they shall be drawn and paid out as the building progresses, in such amounts and at such times and dates as the owner may agree upon, or, if they fail to agree, as the underwriter may determine as necessary and best. . . The underwriter may at all times hold sufficient of such funds on deposit in said bank or banks as he may select to entirely complete the building contemplated to be erected hereunder, free from any and all liens that are prior to said trust deed, and shall stop disbursements of said proceeds of said bonds at any time until such deficiency is made up by the owner. The owner will furnish to the underwriter waivers of liens and receipts for the payments of moneys for material and labor entering into the construction of said building, or satisfactory sworn statements showing such payments as will, under the law, relieve the property from liens in favor of materialmen, mechanics, and contractors, so as to always maintain said trust deed or mortgage as a first lien against said property, and under no circumstances shall the underwriter be held liable to the contractors," etc.

It is further provided in this agreement, that, though the bonds shall bear interest only at 6-1/2 per cent., the underwriter may deduct the sum of $6250 from the proceeds of the bond issue, in order to make them yield 7-1/2 per cent. "In consideration of the discount received on said bonds by the underwriter, the underwriter assumes full responsibility for the sale of said bonds and for the paying over and depositing, in the bank or banks selected, the $98,000 which the owner is to receive for said bonds, and agrees to supervise the progress of the construction of the building and make disbursements and payment of the proceeds of said bonds from time to time on vouchers for materialmen, contractors, subcontractors, laborers, or others," etc. "The underwriter, its agents, officers and attorneys shall incur no personal liability for what it or they may do or omit to do under the powers and duties contained in this

agreement, except to faithfully account for the proceeds of said bonds as hereinbefore set out, and in case of its or their own gross negligence. The place of performance of this contract is hereby fixed at Atlanta, Georgia, and this contract is a Georgia contract and will be construed by the laws of the State of Georgia. The proceeds from said bonds, less any deductions which the underwriter may be entitled to deduct therefrom under any provisions of this contract, shall be disbursed in amounts as follows: 60 per cent. when title, satisfactory to underwriter's attorneys, is passed to said trustee by trust deed or mortgage, and complete abstract of title is furnished in accordance with paragraph 10. The remaining 40 per cent. shall be disbursed within 30 days after substantial completion of the entire work; it being expressly understood and agreed that no disbursements whatever shall be made unless and until the underwriter has been furnished whatever certificates may be required by underwriter's attorneys, certifying that there are no liens against said building." A trust deed was executed and delivered to G. L. Miller & Company Inc., as trustee, that company having elected to name itself as trustee.

The evidence, besides the underwriting agreement and trust deed, before the court below on the hearing for the appointment of a receiver was as follows: A signed statement by James A. Stewart certified that the proceeds of the bond sale ($98,000) "were made by G. L. Miller & Co. Inc., upon my order to them and under my direction; and I hereby approve, confirm, and ratify each and every disbursement so made as aforesaid and enumerated, and discharge G. L. Miller & Co. Inc. from all and any claims or liabilities of every kind arising out of this transaction." An affidavit by James A. Stewart was to the effect that he knew nothing about the matters, as Fred P. Jeter acted as his agent in the negotiations and transactions. An affidavit of W. E. Daniel was to the effect that prior to the filing of the petition in this case Jeter stated to him (Daniel), a representative of G. L. Miller & Co. Inc., that he had bought the Somerset Apartments from Mr. Stewart in order to get revenge on G. L. Miller & Co. Inc., because the latter had taken or caused to be taken other apartment buildings from the management of Grant-Jeter Co., of which deponent was an officer.

The defendants introduced the affidavit of Fred P. Jeter, in substance as follows: Deponent is one of the defendants in this case. At the time of the bond issue on the Somerset Apartments, deponent was the agent of James A. Stewart, the other defendant, and handled for him all of the transactions connected with the bond issue. The transaction with reference to the bond issue was a loan or advance of money by G. L. Miller & Co. Inc., to Stewart, evidenced by the bonds of Stewart payable to bearer, and issued by him under the deed of trust referred to in the petition. Stewart executed $112,000, face value, of the bonds or notes and delivered them to G. L. Miller & Co. Inc., on or about July 23, 1923, which bore interest at 6-1/2 per cent. per annum from date. One item on a statement furnished by G. L. Miller & Co. Inc., as to settlement of their loan to Mr. Stewart in return for his bond issue, is entered as "yield premium $6,250." Deponent testifies that this means and 'was intended by the parties to mean that this further discount was charged against the bond issue at the time the same was taken by Miller & Co., and it represents that much money out of the face of the bonds, which was never received by Mr. Stewart or by any one for his account. The actual settlement of the transaction was that Miller & Co. advanced or loaned to Stewart $89,930.02, and that Stewart issued to them his bonds for the aggregate amount of $112,000, or, stated otherwise, that they took said bonds at a discount of $22,069.98, etc. After this suit was filed, Jeter paid the State, county, and city taxes for the year 1924, the non-payment of which had been set up as one of the defaults. It was conceded that prior to March 1, 1924, Stewart paid into the hands of the trustee $4,848 as installments on principal and interest maturing prior to March 1, 1924; and that all of the bonds secured by the trust deed had been sold, before due, by Miller & Co. to various persons in good faith and for value.

The court appointed a receiver to take possession of the described premises, to collect all of the rents, profits, and income from the property, and to make no disbursements therefrom except to supply heat, water, and janitor service for the premises, without further order from the court. To this judgment the defendants excepted.

*Little, Powell, Smith & Goldstein, King, Spalding, MacDougald & Sibley,* and *Troutman & Troutman,* for Stewart et al.

*Anderson, Rountree & Crenshaw and W. H. Mewbourne,* contra.

PER CURIAM. (After stating the foregoing facts.) The controlling question in this case is, was the transaction between the parties, as disclosed by the evidence, usurious? It is contended on the part of the plaintiffs in error that the transaction was usurious. This contention is denied by the defendant in error. It is therefore necessary to examine the evidence and to determine whether or not as a matter of law the contract or agreement between the parties is infected with usury. Under the law of Georgia, where a transaction is usurious all interest is forfeited, but no other forfeiture shall be occasioned. Acts 1916, p. 48, 9 Park's Code Supp. 1922, § 3438. The Georgia law on the subject of what interest can be lawfully charged is contained in the Civil Code of 1910, § 3436, as follows: "It shall not be lawful for any person, company, or corporation to reserve, charge, or take for any loan or advance of money, or forbearance to enforce the collection of any sum of money, any rate of interest greater than eight per centum per annum, either directly or indirectly by way of commission for advances, discount, exchange, or by any contract or contrivance or device whatever." The question to be determined is whether the transaction in the present case was a loan by G. L. Miller & Co. Inc. to James A. Stewart, and whether, if a loan, it was infected with usury on account of the discounts and deductions made from the amount loaned; or whether, as contended by the defendant in error, the agreement between the parties in writing, the substance of which is set out in the statement of facts, was merely an "underwriting" agreement by which the defendant in error, for a certain consideration, was to perform certain services, and to advance a certain amount of money to the plaintiff in error. Of course, if the agreement was a mere device or subterfuge by which the defendant in error was permitted to charge a higher than the lawful rate of interest allowed in this State for a loan of money, the agreement would be usurious, and the company could collect no interest at all. But its insistence is that this is an *underwriting agreement;* and therefore it becomes necessary, in the view we take of the case, to consider what an underwriting

agreement is. "Underwriting means an agreement made before the shares are brought before the public, that, in the event of the public not taking all the shares or the number mentioned in the agreement, the underwriter will take the shares which the public do not take." 1 Cook on Corp. (7th ed.) 74, § 14; 3 Bouv. Law Dict. (Rawle's ed.) 3352; Machen's Mod. Law of Corp. § 419. Underwriting of corporate bonds has been defined "an agreement by the subscriber, based on a consideration, to insure the sale of the bonds subscribed at a stipulated price." 1 Fletcher's Cyc. Corp. § 442. "An underwriting agreement is to be distinguished from a subscription agreement whereby the subscribers themselves become the owners of the stock." Id. § 444. This same author declares that it is usual under an underwriting agreement to pay a commission to the underwriter for his services in selling the bonds. Ib. § 452. "Where an agreement provides for the underwriting of shares at a discount of a certain per cent., the word 'discount' is to be construed as equivalent to the term 'commission.'" Ib. § 453, and note. In the case of Busch *v.* Stromberg-Carlson Tel. Mfg. Co., 217 Fed. 328, 331 (133 C. C. A. 244), it was held that an underwriting contract is not a contract to make a loan, but is one to insure the sale of bonds. "It is a contract to insure the sale of the bonds subscribed; and in case they are not sold before the installments fall due, then to purchase and pay for them at par. It is an underwriting, and not an agreement to loan money."

From a careful reading of the agreement or contract between the parties in this case it will be observed that the defendant in error is referred to throughout the agreement as the "underwriter," and not as a lender. In the agreement it is provided: "In order that the underwriter may offer said bonds on a basis to yield 7-1/2 per cent., it is hereby agreed by the owner that said underwriter shall deduct $6250 from the proceeds of said bond issue for the provision of such additional yield. . . In consideration of the discount received on said bonds by the underwriter, the underwriter assumes full responsibility for the sale of said bonds, and for the paying over and depositing, in the bank or banks selected, the $98,000 which the owner is to receive for said bonds, and agrees to supervise the progress of the construction of the building and make disbursements and

payment of the proceeds of the bonds from time to time on vouchers for materialmen, contractors, subcontractors, laborers, or others, on the orders of the owner upon the receipt of the necessary waivers of liens, and affidavits which have the effect of waivers of liens, satisfactory to the underwriter, and shall generally supervise the erection of the building and the disbursement of the moneys employed in said building, to the end that this contract shall be carried out so as to fully protect the purchasers and holders of said bonds. The underwriter shall have the privilege of entering in and upon the premises of the building during the construction, for the purpose of examining the progress made and the material used, and shall have the privilege of having its engineers, architects, or contractors make periodical examination if such appears to it as necessary during the period of construction, provided such examination or inspections do not interfere with the workmen or construction progress," etc.

We are of the opinion, under the facts in this case, that it can not be said as a matter of law that this agreement was a mere device or subterfuge for charging more interest than that allowed by the laws of this State for a loan of money. On the contrary, it appears that under the agreement the underwriter was to perform certain services to the owner of the building, which if preformed were valuable; and it can not be said as a matter of law that the amount deducted from the total amount of the bonds was an unreasonable amount for the services to be performed. Under the evidence in the case the judge was authorized to appoint a receiver.

As the judgment of the court below is affirmed on the main bill of exceptions, the cross-bill of exceptions will be dismissed.

*Judgment affirmed on the main bill of exceptions; cross-bill dismissed. All the Justices concur, except Russell, C. J., and Hines, J., dissenting.*

RUSSELL, C. J., dissenting. In this case the exception is to the appointment of a receiver. The subject-matter of the litigation, the nature of the proceeding, the legal contentions of the adverse parties, and the material facts disclosed by the evidence will hereinafter be more fully pointed out. At the conclusion of the hearing upon the application for a receiver to take charge of an apartment house in the City of Atlanta, which had been

conveyed under a deed of trust to secure an issue of bonds amounting to $112,000, the court passed the following order: "The argument on the rule nisi having been heard, and the evidence having been heard and considered by the court, it is hereby ordered and decreed that W. S. Dillon be appointed receiver to take possession of the described premises, to collect all the rents, profits, and income from the said property; and the said receiver is directed to make no disbursements from said rents, income, and profits, except to supply heat, water, and janitor service for said premises, without a further order from the court. The said receiver shall give bond for the sum of $5000 for the faithful performance of his duties as such receiver."

On July 23, 1923, James A. Stewart (designated as owner) executed a deed to G. L. Miller & Company Inc. (designated as trustee), a corporation of the State of Delaware, having a place of business in Atlanta, Georgia, conveying certain premises described in the deed, known as number 91 East 14th Street. The expressed consideration is "for and in consideration of the premises and the sum of $1.00." The "premises" referred to as part of the consideration as set forth in the deed of trust are contained in a previous recital in the instrument, to the effect that the owner has issued 279 bonds aggregating $112,000 (specifying the denomination of each of the bonds), bearing interest at the rate of six and one-half per cent. per annum, payable semi-annually on the 23rd day of January and July and maturing $2000 on July 23, 1925, $2500 July 23, 1926, $3500 July 23, 1927, $4500 July 23, 1928, $6000 July 23, 1929, $7500 July 23, 1930, $86,000 July 23, 1931, being the final payment, with coupons attached, to each bond evidencing the semi-annual payments of interest thereon. In accordance with one of the provisions of the deed of trust and upon an allegation a default in payment of interest, insurance, taxes, etc., in violation of the agreement, the trustee declared the entire debt evidenced by the bonds to be due, and, basing its prayer upon the contract known as the "underwriting agreement," asked that a receiver be appointed to collect and hold the rentals accruing from the property for the protection of the bondholders. The defendants contested the appointment, upon the ground that there had been no default, and for that reason the stipulation with reference to a

receiver was not operative. They set up that no interest is due, because, under the provisions of the act of 1916 (Acts 1916, p. 48), all interest upon the sum of money advanced by G. L. Miller & Company Inc. has been forfeited under the penalty imposed by the act of 1916, supra, providing a forfeiture of all interest where a higher rate of interest is charged for the use of money than eight per cent. The paramount question in this case, therefore, is whether the contract between the parties is usurious. In order to determine this question we must inquire into the nature of the contract and correctly classify it. What was the intention of the parties in making the contract? The first rule in the construction of contracts requires that the intention of the parties be ascertained. Then, does the contract between the parties in this case bespeak a sale of Stewart's bonds to G. L. Miller & Company Inc., or a loan of $89,930.02 by Miller to Stewart; or can the underwriting contract be treated as evidencing only an agreement between the parties that G. L. Miller & Company Inc. was to act as agent in behalf of Stewart, receiving for its services as such agent in the sale of the bonds and the supervision of the construction of the building such compensation as is specified in the paper called the underwriting agreement?

Section 3436 of the Civil Code of 1910 refers especially to devices or subterfuges by which a higher rate of interest than that prescribed by law is obtained, and denounces each and all of them. For this reason nomenclature is unimportant in the consideration of a transaction, when the existence or nonexistence of usury is the subject of legal investigation. It is not a question of what disguise may be attempted to conceal the usury, or what device may be used as a cover. If the nature of the transaction is such that it is apparent from the stipulations, conditions, or requirements of the agreement that usury is being disguised, the law makes it the duty of the courts to tear away the mask, and, disregarding outward appearances, to declare that usury is present though it be cloaked in the livery of an apparently legal contract. Any agreement the practical effect of which is to charge or collect a profit for the use of money greater than 8% is usurious. *Bank of Lumpkin* v. *Farmers State Bank,*

ante, 801 (132 S. E. 221). There can be underwriting agreements
in which a deduction for services to be rendered by the under-
writer in disposing of stocks or bonds can properly be made by way
of service charges or commissions for the specific service or serv-
ices. But charges for services in obtaining money for a bor-
rower, whether upon notes or bonds, can not be charged or col-
lected where the so-called agent or underwriter himself furnishes
the money. *Beach* v. *Lattner,* 101 *Ga.* 357 (28 S. E. 110). In
the *Beach* case it was held that "Where a deed, executed as se-
curity for the payment of a promissory note, is assailed as usuri-
ous, the usury alleged to have been taken consisting of a cer-
tain bonus paid by the maker to the payee of the note in excess
of the lawful rate of interest, and a third person to whom the
note and security deed are transferred seeks to uphold the trans-
action by showing that such third person was the real lender, and
that the payee of the note was a mere intermediary, the bonus
exacted being by way of compensation to the latter [the payee],
and in no manner participated in by the former [the purchaser
of the note]; the question of usury depends upon whether such
third person was in fact the real lender. . . A grantee in a
security deed tainted with usury can not, as against the maker
thereof, convey a good title even to a third person who takes
bona fide, before maturity, for value, and without notice of the
fact of usury." The act of 1916, supra, changed the penalty
inflicted upon an usurious lender from avoidance of the title pur-
ported to be conveyed by the security deed to a penalty subject-
ing him to loss of all interest; and upon the same principle
which underlies the decision in the *Beach* case, where the penalty
which avoided the deed given to secure the debt was imposed al-
though there had been a transfer of the deed to an innocent pur-
chaser, it would seem that where one who purchased a note pur-
porting to bear a stipulated rate of interest, but which is in fact
usurious, would suffer the same legally imposed penalty as the
original payee of the note. To paraphrase the language in the
*Beach* case, if the lender had no right to interest, "his grantee
[transferee] could take none." There is no difference in the
principle of the two supposed cases, though in the one usury
avoided the title which secured the debt, and in the latter all in-
terest is forfeited as a penalty for the taking of usury. But in

discussing one of the minor points we have stepped aside from, the consideration of the main question as to usury, and in the *Beach* case it was held to be usury where a sum of money in excess of eight per centum was withheld from the borrower, regardless of the penalty affixed to the usury.

Then was G. L. Miller & Company Inc. the lender of the money from which it was agreed that $22,069.98 should be deducted, —$14,000 as "discount," and $6250 as "yield premium," besides other minor deductions? We think the evidence compels the conclusion that Miller advanced the money, for the statement given to Stewart stated the sum of money advanced as $98,000, and, after deducting the charges to which we have referred, contained only two items paid by Miller to Stewart, amounting together to $88,930.02. No witness representative of G. L. Miller & Company Inc. was produced to explain the circumstances appearing from the contract, which unexplained inevitably compel the conclusion that that company as purchaser of the bonds itself advanced the money for the so-called loan. The language of the 5th and 6th paragraphs of the underwriting agreement indicates a purchase, in that it is provided that for the $112,000 of bonds Miller shall in no event be required to account to Stewart for more than $98,000, and that it can do with the bonds just as it pleases, either sell them or keep them. An ostensible purchase of the bonds by the Miller Co., with the provision that although it had bought them it should be thereafter permitted to make charges for yield service and attorney's fees, would be a device so transparent as to disclose a mere contrivance to conceal usury under the guise of purchase. If Miller had really purchased the bonds for $98,000, there would have rested upon Stewart no duty or obligation of any kind to make such a discount in the selling price of the bonds below par as would enable purchasers from Miller to net seven and one-half per centum interest. Owning no further interest in the bonds which had been sold to Miller, it would certainly not concern Stewart whether the bonds were sold or Miller remained the owner. Stewart's only possible obligation, duty, or interest would have been to pay the interest and principal upon the issue of bonds in accordance with the contract. So I conclude that the contract is usurious. This being true, it was error to

appoint a receiver, because the contention of the plaintiffs in error that they had made sufficient payments to discharge all the obligations under the contract except the interest, and that by reason of usury no interest was due, was demanded. Even under the contract a receiver could not be appointed unless there had been a default; and it having been shown that all interest had been forfeited on account of usury, and that payments had been made sufficient to cover the other provisions of the contract with reference to insurance, taxes, payments upon the sinking-fund, and payments upon the principal for the purpose of accumulating a sinking-fund, no ground existed authorizing the defendants to be deprived in this drastic manner of the control of the property pledged to secure the debt. There is no allegation that either Stewart or Jeter is insolvent; and though Stewart had contracted that a receiver might be appointed, regardless of the question of insolvency, if there was a default in the payment of interest, as well as default in complying with any of the other requirements referred to, a default as to some of these must have been shown before the appointment of a receiver would have been authorized even under the contract. Under the general principles of equity a receiver could not properly have been appointed to take in charge the property of a debtor whose solvency is not questioned, in the absence of a showing that the borrower had defaulted in some of the duties which he imposed upon himself by entering the contract.

Does usury affect a purchaser who buys in good faith negotiable securities with no knowledge that there was any usury in the transaction? It is earnestly insisted by learned counsel for the defendant in error that upon principle an innocent purchaser should be protected; and that it appears from the record in the first case in which this court ruled that usury could be pleaded against the purchaser of an usurious obligation that the paper was past due when purchased by the holder. This was also adverted to in *Bank of Lumpkin* v. *Farmers State Bank.* We are asked to review and overrule decisions contrary to the reasoning of Mr. Justice Lamar in the case of *Weed* v. *Gainesville Railroad Co.,* 119 *Ga.* 576, 593 (46 S. E. 885), to the effect that the law merchant protects the innocent holder of negotiable paper bought before due and for value; and it is insisted that

it must appear that the consideration of the negotiable paper was both illegal and immoral, before the plea of usury can be asserted against an innocent purchaser. It is to be noticed that what was said by Mr. Justice Lamar in the *Weed* case was merely the expression of his personal opinion. This, as the member of the court delivering the opinion, he had a perfect right to express, but no member of the court concurred in this view. The principle that the plea of usury is available even against a bona fide purchaser who has no notice of the existence of usury, and even though the paper be purchased before its maturity, is so well settled in this State, and, as I think, is based upon such solid grounds, that we shall not review or overrule the long line of decisions in which the rule has been steadfastly adhered to. Though in *Bailey's* case, 1 *Ga.* 392, it appears that the paper purchased was past due, an examination of the record in nearly all subsequent cases, so far as we have been able to discover, discloses that the paper claimed to be usurious was purchased before it was due; and yet, without a single exception, the court has held that it was at least more immoral to permit usury to be originally extorted from a borrower than to compel one who was absolutely ignorant of this moral taint to lose money which he had spent in the utmost good faith. Among a multitude of cases which could be cited we refer to *Bailey* v. *Lumpkin,* 1 *Ga.* 392; *Laramore* v. *Bank of Americus,* 69 *Ga.* 722; *Pottle* v. *Lowe,* 99 *Ga.* 576 (27 S. E. 145, 59 Am. St. R. 246); *Angier* v. *Smith,* 101 *Ga.* 844 (28 S. E. 167); *Atlanta Savings Bank* v. *Spencer,* 107 *Ga.* 629 (33 S. E. 878); *Clarke* v. *Havard,* 111 *Ga.* 242 (36 S. E. 837, 51 L. R. A. 499), s. c. 115 *Ga.* 882 (42 S. E. 664); *Wacasie* v. *Radford,* 142 *Ga.* 113 (82 S. E. 442); *Strickland* v. *Wilson,* 145 *Ga.* 218 (88 S. E. 921).

We agree with the learned counsel for the defendant in error that perhaps immorality must join with illegality to constitute usury; but from the earliest time the taking of usury has been deemed to be immoral. The taking of usury may be malum prohibitum. For long eras of history it was not, but usury has always been malum in se. The fact that commercial usage and innumerable transactions have arisen which did not exist in biblical times, and have authorized legislation to permit a reasonable

charge for the use of money, certainly does not make moral the extortion of a rate based upon the necessity of the borrower and the cupidity of the lender, which even human law does not sanction, but on the contrary recognizes to be unconscionable and therefore immoral. Among the defenses which may be interposed to the claim of even an innocent purchaser before maturity, section 4286 provides as one available against the innocent holder of commercial paper the avoidance of a paper based upon "illegal and immoral consideration." In numerous rulings of this court touching the subject of usury it will be found that usury is treated as a claim based not only upon an illegal but also an immoral consideration. For the clarity of Mr. Justice Lamar's intellect, for his magnificent ability as a lawyer, and for his fearless sense of justice, we entertain the highest regard. His career is one of the proudest monuments to mark and preserve the fame of Georgia's bench and bar. But as Homer sometimes nods, it is plain that the remarks of Justice Lamar in the *Weed* case, supra, were based upon a misapprehension that at the time *Bailey* v. *Lumpkin* was decided the law made the entire contract void when usurious. As matter of fact this was not the case. Under the provisions of the act of 1845 the law at the time the decision in *Bailey* v. *Lumpkin* was made was precisely as it has now been made by the passage of the act of 1916, supra.