Russell Firebaugh, Trustee, Defendant in Error, v. Ellen Seegren et al., Plaintiffs in Error.

Gen. No. 35,419.

Heard in the first division of this court for the first district at the October term, 1931. Opinion filed February 29, 1932. Rehearing denied March 14, 1932.

ERNEST A. EKLUND and FREDERICK J. BERTRAM, for plaintiffs in error.

MORTON S. CRESSY, for defendant in error; PRESTON CLARK, of counsel.

Mr. Justice Matchett delivered the opinion of the court.

By this writ of error defendants, in a proceeding brought by the trustee to foreclose a trust deed, seek to reverse a decree in favor of complainant entered on July 18, 1931. The cause was heard by the chancellor upon exceptions to the report of the master. The report recommended a decree of foreclosure as prayed in the bill and the findings of the master were confirmed by the chancellor. The decree found the total unpaid indebtedness secured by the trust deed to be $71,522.37 and directed the sale of the premises in case of a further default in payment.

The original indebtedness was $67,500 represented by 115 bonds, all of which were dated March 1, 1929, and drew interest at the rate of 6½ per cent per annum, payable semiannually until maturity, and 7 per cent after maturity, the interest which should become due thereon being evidenced by coupons attached to the respective bonds. The bonds by their terms matured on different dates from September 1, 1929, up to March 1, 1936, when the entire issue would become due and payable. All of these bonds were secured by a trust deed given to complainant, said trustee being the president of the Bond and Mortgage Co. which undertook according to the terms of a contract of the same date to underwrite and dispose of the bonds.

The principal defense interposed by the answer of defendants is that the contract for the sale of these bonds to the Bond and Mortgage Co. was usurious in its nature and a violation of sections 5 and 6 of chapter 74 of the Illinois Revised Statutes, Cahill's St. ch. 74, ¶¶ 5, 6. (See Smith-Hurd's Ill. Rev. Stats. 1931, secs. 5 and 6, chap. 74, p. 1755.) It is insisted by defendants and not denied by complainant that if the original contract was usurious, then the defense may be interposed effectually in a proceeding to foreclose a mortgage, even as against an innocent pur-

chaser and before maturity. *Olds v. Cummings,* 31 Ill. 188; *Schultz v. Sroelowitz,* 191 Ill. 249; *Pittsburgh Plate Glass Co. v. Kransz,* 291 Ill. 84; *Hirsh v. Arnold,* 318 Ill. 28.

The facts upon which the defense of usury is urged seem to be that the defendant mortgagors made an application to the Bond and Mortgage Co. for a loan of $61,630.28, which was the amount needed by them to take up and pay a first mortgage bond issue against their real estate which would mature March 7, 1929. Pursuant to negotiations between the parties a written agreement was made between defendant owners and the Bond and Mortgage Company on March 1, 1929. In this agreement the owners are referred to as the seller and the Bond and Mortgage Co. as the purchaser. The agreement provides:

"The Purchaser has agreed to purchase and the Seller has agreed to sell an issue of coupon bonds, provided the various assertions of the maker hereinafter contained are found to be correct, upon the following mutual terms and conditions:" The agreement then provides that the amount of the bonds should be $67,500; that they should be issued by the seller and sold and delivered to the purchaser and should be secured by a deed of trust; that pending the preparation of definite bonds, a temporary bond for the amount of the issue should be delivered by the seller to the purchaser.

Article 10 of the agreement provides:

"The Purchaser agrees to purchase and the Seller agrees to sell and deliver to the Purchaser said bond issue for a sum equal to ninety-three per cent (93%) of the par value thereof, no accrued interest to be paid, and the proceeds of said sale (towit: ninety-three per cent (93%) of the par value thereof) to be held, applied and disposed of in the manner and under the conditions provided for in Article XII hereinafter set forth. This agreement for the purchase and sale of

said bonds is entered into with a view to the marketing of said bonds of the Seller to the investment public, and as consideration for the amount of discount at which said bonds are purchased as aforesaid, the Purchaser agrees to defray all the expenses of marketing said bonds, including advertising and all other sales expense including planning of sales and hiring of salesmen, whether with respect to this specific issue of bonds or the securities generally marketed by the Purchaser or companies affiliated with the Purchaser (other than expenses elsewhere herein specifically provided to be borne by the Seller), and to furnish the services of the named trustee and named successors in trust under said trust deed.''

The eleventh provision of the agreement provides that the seller shall pay reasonable attorneys' fees incurred and all legitimate or proper expenses connected with the making of the bond issue. The agreement states that the seller authorizes the purchaser to represent the seller and subscribe and execute on behalf of the seller any and all requisite applications and other instruments in connection with procuring authority for the issuance and sale of the bonds in any state or jurisdiction. Such expenses actually amounted to the sum of $585.30. The seven per cent discount or commission amounted to $4,725, and these deductions left from the loan of $67,500 a credit of $62,189.70, available for use in retiring the old first mortgage bond issue. The total amount due upon this issue was $61,630.28, leaving a balance in the fund of $559.42 to the credit of the mortgagors. If the discount of $4,725 may be considered as a profit which accrued to the Bond and Mortgage Co. for the loan and forbearance of money, then the amount of such charge would exceed the sum of seven per cent per annum and would constitute usury under the statute; and the controlling question in the case therefore is whether this agreement was a contrivance for the purpose of evad-

ing the statute and securing an illegal charge for use of money loaned or whether the charge was a proper one for services rendered by the Bond and Mortgage Co. in that connection.

A leading case in Illinois upon the construction of the usury statute is *Clemens v. Crane,* 234 Ill. 215. It is there said:

"To constitute usury, in contemplation of law, the following essential elements must be present: (1) There must be a loan or forbearance; (2) the loan must be of money or something circulating as money; (3) it must be re-payable absolutely and at all events; (4) something must be exacted for the use of the money in excess of and in addition to the interest allowed by law." The opinion of the court adds that some decisions imply that a fifth element should be added, consisting of the intent of the parties or at least of the lender, but the opinion states: "It seems to us quite as accurate to say that the intention of the parties as the same appears from the facts and circumstances of the case may be considered, in connection with the other evidence, in determining whether the essential elements of usury are present in the particular case under investigation. The form of the contract is not conclusive of the question."

The mere verbal raiment in which an agreement is clothed will not be permitted to hide the real character of the transaction, and no device will be allowed to cover up its real character. Therefore, the courts hear extrinsic evidence and resort to parol evidence for the purpose of determining the actual fact as to whether there has been an intentional violation of the statute, the purpose of which is to prevent extortion, wrong and oppression. The defense, however, is an affirmative one, and the defense must be established by clear and convincing evidence.

Was this contract between these parties for the issuance of these bonds usurious in its nature? The

fact that the borrower is therein described as the seller and the lender as the purchaser is not conclusive upon that issue, if it appears from all the evidence that the effect of the transaction was to enable the Bond and Mortgage Co. to loan its money at a usurious rate. We are not able to find such intention of the parties in this transaction. The contract seems to be one which has become well known in the financial and business world as an underwriting contract. That is defined by one author: ''An agreement by the subscribers, based on a consideration, to insure the sale of the bonds subscribed at a stipulated price'' (1 Fletcher, Cyc. Corp., sec. 442), or, as another author states, ''Underwriting means an agreement made before the shares are brought before the public, that, in the event of the public not taking all the shares or the number mentioned in the agreement, the underwriter will take the shares which the public do not take.'' (1 Cook, Corp. 7th ed., 74, sec. 14; 3 Bouvier's Law Dict.; Rawle's ed. 3352; Machen's Corp., sec. 419.) That the purpose of this agreement was to secure the sale of defendants' bonds to the public and that the discount allowed upon the purchase price of the bonds was compensation for the services to be rendered in that respect, seem to be borne out by all the facts and circumstances which appear in the case; namely, that the bonds were so disposed of through the efforts and the services of the Bond and Mortgage Co., and that under the terms of this contract the Bond and Mortgage Co. was absolutely held to a purchase of the same at this price, which would guarantee to defendants the sale of these bonds and the receipt by them of the money needed in order to pay off the old loan. There is no evidence tending to show that there was anything unusual or oppressive about the agreement; that the services were not performed nor of the value represented by the discount allowed. The courts of Georgia were called upon to construe a quite similar

contract in the case of *Stewart v. Miller & Co.*, reported in 161 Ga. 919, 132 S. E. 535; annotated in 45 A. L. R. p. 570. The amount of the bonds issued in that case was $112,000 and the amount of the discount was $6,250. The Supreme Court there said that in view of the services performed by the bond company it could not say that the agreement was a device or subterfuge for charging more interest than allowed by law or that the amount was an unreasonable consideration for the services which were performed. Two of the justices dissented upon the ground that the transaction in question was in the nature of a loan rather than a contract for services.

Here, the transaction was in the form of a contract for purchase with an agreement to perform services. In effect, the Bond and Mortgage Co. guaranteed the sale of defendants' bonds to the public and agreed to perform the services necessary to sell the same for a commission of seven per cent, which there is no evidence to indicate is unreasonable. We therefore hold that there was no usury in this transaction.

The foregoing practically also disposes of the second ground on which we are asked to reverse the decree, namely, that the proofs fail to establish any default upon which complainant would be entitled to a decree of foreclosure. That would be true, if the defense of usury were established, but otherwise the contention is without merit.

The decree finds (and the proof tends to show) that on September 1, 1930, bonds numbered 7 to 9, inclusive, in the sum of $500 each, became due and payable; that interest coupon notes numbered 3 on the balance of the indebtedness remaining unpaid, amounting to $2,096.25, became due on the same date, and that after crediting defendants with monthly deposits theretofore made in accordance with the trust deed, amounting to $862.19 on account of principal and $1,397.49 on account of interest coupons numbered 3, there still re-

mained due on September 1, 1930, on principal and interest, the sum of $1,336.57, and that no payment on account thereof had been made. The decree further finds default by defendants in failing to comply with section 1, article 2, of the trust deed, by which they agreed to pay on or before the first day of each month beginning with April, 1929, and ending with March, 1936, an amount equivalent to one-sixth of the next maturing interest payments upon all bonds then outstanding and to pay on or before the first day of each month beginning with April, 1929, and ending with September, 1935, an amount equivalent to one-sixth of the principal of the instalment of bonds then next maturing, and that defendants defaulted in making such payments which became due on September 1, 1930. It further finds (as the evidence tends to show) that defendants had failed and neglected to pay the taxes on the premises for the years 1928 and 1929, or to make the deposit therefor required by section 1 of art. 2 of the trust deed. The trust deed provides that for any or either of these defaults the trustee might elect to declare the whole principal due and payable, which he did on September 3, 1930.

Defendants contend in the third place that the court erred in decreeing a foreclosure, since only three of the entire issue of bonds were produced at the hearing, and it is earnestly contended that complainant was not entitled to a complete foreclosure for all outstanding bonds without producing the same. Defendants even suggest that neither the fact of the existence of the bonds nor of the delivery of them were proved upon the hearing, nor was there an authentication of the same as required by the trust deed. These facts, however, were proved by the testimony of the trustee as is disclosed by an examination of the record. In support of their contention that it was necessary to produce and prove up the individual bonds which the trustee sought to foreclose, defendants say that it

has uniformly been held to be the law of this State that such production and proof are necessary and they cite in support of this contention a number of cases, such as *Dowden v. Wilson,* 71 Ill. 485, and *Martin v. Frank,* 259 Ill. App. 417. That such has been and is the general rule may be conceded, but in view of the nature of this proceeding and of the provisions of the trust deed, we think the present case falls within an exception to that rule. Section 1 of article 9 of the trust deed provides:

"In any case in which, under the provision of any article herenabove, the Trustee has the right to declare the principal of all or any part of the bonds hereby secured and outstanding to be due and payable immediately the Trustee *may, without any action on the part of any bondholder,* and without declaring said bonds due, and upon the written request of the holders of not less than one-fourth in amount of said bonds then outstanding, *shall* institute such suit in equity or at law, in any court of competent jurisdiction, to enforce and protect any of his rights or the rights of the bondholders hereunder, as he may deem proper, and especially may institute proceedings to foreclose this Indenture in any manner provided by law and to obtain a sale of the said estate and premises under order of court." As we construe this section of the trust agreement, it confers upon the trustee power to foreclose without regard to his possession of any bonds and without regard to any request from any bondholder. In case of default on his part to take action, the holders of one-fourth of the amount of the bonds may then compel him to institute such suit. The duties conferred upon a trustee to whom is given such power by the trust agreement is of an active nature and differs very much from the case where he is simply the passive holder of a legal title. The distinction has been pointed out by our Supreme Court

in well considered cases, one of which is *Chicago & G. W. R. Land Co. v. Peck,* 112 Ill. 408, where the court, speaking through Justice Sheldon, after stating the general rule that all persons interested in the subject matter of a suit in equity, including *cestuis que trust,* are to be made parties, says: ''(quoting from *Van Vechten v. Terry,* 2 Johns. Ch. 197) 'This is one of those cases in which the general rule cannot and need not be enforced, for the trustees sufficiently represent all the interests concerned; they were selected by the association for that purpose, and we need not look beyond them.' And see *Shaw et al. v. N. C. R. Co. et al.,* 5 Gray. 162; Story's Eq. Pl., secs. 142, 216, 217. We regard the present as a clear case within the exception to the general rule of equity pleading, that all persons interested in the subject matter of the suit must be made parties to the bill.'' To the same effect is *Farmers' Loan & Trust Co. v. Lake Street Elevated R. R. Co.,* 173 Ill. 439, where Mr. Justice Magruder, after stating the general rule, said that there were two well established exceptions to it, the first being where absent parties were properly represented as in the case of a trustee for bondholders, and, second, where the beneficiaries were so numerous that the delay and expense of bringing them in would become oppressive and burdensome. In the quite recent case of *American Trust & Safe Deposit Co. v. 180 E. Delaware Bldg. Corp.,* 262 Ill. App. 67, the Second Division of this court had occasion to consider the precise question as to whether under the provisions of a trust deed quite similar to this one, it was necessary to make any of the bondholders parties complainant or defendant to the bill. The court, after considering the cases, said:

''No bondholder had an absolute right of intervention, especially in the absence of any allegations of fraud, misfeasance or bad faith on the part of the trustee. (*Chicago & G. W. R. Land Co. v. Peck,* 112

Ill. 408, 435–6; *St. Louis & Peoria R. Co. v. Kerr,* 153 Ill. 182, 196; *Farmers' Loan & Trust Co. v. Lake Street Elevated R. Co.,* 173 Ill. 439, 459–60; *Guaranty Trust Co. v. Chicago, M. & St. P. Ry. Co.,* 15 Fed. [2d] 434, 440; *Bowling Green Trust Co. v. Virginia Passenger & Power Co.,* 132 Fed. 921, 926.)''

The Encyclopaedia of Pleading & Practice, vol. 9, p. 400, states that the rule which required the production of the note or bond or satisfactory explanation of its absence is not applicable in the foreclosure of a mortgage where the debt evidenced by the note or bond sufficiently appears from the terms of the mortgage alone, and that it need not be produced until rendition of the decree, citing as authority *Northern Trust Co. v. Columbia Straw-Paper Co.,* 75 Fed. 936, where the opinion states:

''Under the contract, these trustees are empowered, as it seems to me, to carry on this foreclosure proceeding and have a decree of foreclosure, without the bonds being produced in the first instance. *Toler v. East Tennessee, etc., R. Co.,* 67 Fed. 169, appears to be in point and to indicate the correct practice.'' The rule is applicable to this record.

The law, we think, must be regarded as established contrary to the contention of defendants by these well considered cases. Of course, as pointed out by the Second Division of this court, the rule would not be applied in case of fraud, misfeasance, collusion or bad faith on the part of the trustee.

The other contentions of the defendants are that the allegations of the bill are not sufficient to support the decree and that the proofs are also insufficient. We have examined the contentions and find them to be without merit.

The further contention is made that the allowance of $3,500 as solicitor's fees was unreasonable and that the decree should be reversed for that reason. In this

matter complainant offered proof tending to show that the fee was usual, just and reasonable for the services performed, and there was no evidence by defendants to the contrary, nor does the fee seem to this court to be unreasonable.

Moreover, the whole record indicates somewhat a determination on the part of defendants to compel the solicitor to earn at least the amount allowed.

For the reasons indicated the decree is affirmed.

*Affirmed.*

O'CONNOR, P. J., and McSURELY, J., concur.