RASMUS P. JENSEN ET AL., APPELLEES, V. LEWIS IN-VESTMENT COMPANY, APPELLANT, ET AL.

FILED FEBRUARY 20, 1894.     No. 5236.

**Principal and Agent:** SUFFICIENCY OF EVIDENCE. The evidence in the case examined and considered, and *held* to sustain the finding of the trial court that S. was the lender's agent in negotiating the loan, and not the borrower's, and that the loss resulting from the failure of S. to pay over the money to the borrower, delivered to him for that purpose by the lender, falls on the latter.

APPEAL from the district court of Douglas county. Heard below before WAKELEY, J.

*Howard B. Smith*, for appellant.

*Morris & Beekman, contra.*

NORVAL, C. J.

The appellant, the Lewis Investment Company, is a corporation organized under the laws of the state of Iowa and engaged in the business of making loans upon real estate security, its principal place of business being at Des Moines. Rasmus P. Jensen made an application to the investment company for a loan of $1,200 on certain real estate owned by him and situate in the city of Omaha. After receiving

notice that the application was accepted, he, with his wife, Mary Jensen, executed and delivered to said company two mortgages covering said real estate, one for the sum of $1,200, due in five years from date thereof, with seven per cent interest, payable semi-annually, and the other for the sum of $60, payable in ten equal payments. Both mortgages were duly recorded in the office of the register of deeds of Douglas county. Subsequently, Jensen sold and conveyed the premises to Ole Oleson, warranting the title against incumbrances. About two years afterwards, Rasmus P. Jensen and Ole Oleson brought this action in the court below to cancel the mortgages, alleging in their petition, as a ground therefor, that the investment company had not paid to Jensen, nor to any one for him, the money agreed to be loaned, but had wholly failed and refused to pay the same, or any part thereof, and that it refused to surrender said mortgages or to discharge the same of record. The investment company filed an answer and cross-petition, making Mary Jensen a party defendant, praying a foreclosure of the mortgages. Upon the hearing the district court found the issues in favor of the plaintiffs, and rendered a decree in accordance with the prayer of the petition.

For convenience we shall hereafter designate Rasmus P. Jensen as "plaintiff," and the Lewis Investment Company as "defendant."

The record discloses that one L. A. Stewart, on and prior to March 17, 1887, was engaged in the loan business in the city of Omaha, and had submitted numerous applications for loans to, and procured loans to be made by, defendant and other loan companies. On the date aforesaid plaintiff applied to Mr. Stewart for a loan of money, and signed and left with him a written application for a loan of $1,200, which application was forwarded by mail by Stewart to the company at Des Moines. In due time the application was approved, papers were prepared by defendant and sent to Stewart, which were subsequently executed by plaintiff.

The money to pay out on the loan was given by the defendant to Stewart, and it is undisputed that the latter never paid any part of the $1,200 to the plaintiff, but absconded without accounting for the same to the defendant.

The only question presented for consideration is: Was the payment of the money to Stewart, in law, a payment to the plaintiff? In other words, was Stewart the agent of the plaintiff in negotiating the loan and receiving the money? A consideration of the evidence in the record satisfies us that the answer should be in the negative, and that the defendant should bear the loss occasioned by Mr. Stewart's dishonesty. That Stewart for a long time prior to the transaction in question had been the agent of the defendant in negotiating loans for it in the city of Omaha there is no room for doubt.

George P. Russell, who was Mr. Stewart's clerk and had charge of his loan office, testified as to the manner in which the business was conducted, as follows:

Q. Were you familiar with the method of transacting business between L. A. Stewart and the Lewis Investment Company?

A. Yes, sir.

Q. State to the court the manner of conducting the business between them.

A. You refer to his negotiating loans?

Q. In regard to this loan business, you say they were in correspondence?

A. Yes, sir.

Q. State the manner of conducting this business.

A. Well, sir, we received the application for a loan on one of the Lewis Investment Company's blanks, which we furnished the party making the application. We then made an examination of the property, procured an abstract and forwarded it to the Lewis Investment Company for their approval. If approved, we received draft, mortgages, notes, and instructions from the company.

Q. Did you have an appraisal made?

A. Yes, sir; that is provided for in the blank.

Q. When was that made?

A. Made before the papers were submitted to the investment company.

Q. Who chose the appraisers?

A. As a general thing, Stewart. If he didn't, the investment company did.

Q. Where were the mortgages made out and prepared?

A. At the office of the company in Des Moines.

Q. What rates were they getting at that time?

A. Their rate was eight per cent.

Q. That is, eight per cent per annum?

A. Yes, sir.

Q. During the course of the loan?

A. Yes, sir.

Q. Usually for five years?

A. Yes, sir.

Q. Two mortgages were made out, were they not?

A. Yes, sir.

Q. The principal mortgage was to secure the principal amount of the loan, was it not?

A. Yes, sir.

Q. What rate of interest would that mortgage draw?

A. If the loan was eight per cent, as a general thing, the first mortgage was made at six per cent.

Q. How was the other two per cent evidenced?

A. By a second mortgage, which ran sometimes one, two, or five years, as agreed.

Q. Who filed these mortgages with the register of deeds?

A. L. A. Stewart.

Q. Was there any custom as to the order in which these two mortgages were filed?

A. The instructions were to file the first mortgage first.

Q. So it would show on the record that it was the prior of the two mortgages?

A. Yes, sir.

Q. What commissions did L. A. Stewart get for doing this business?

A. There was a general understanding on eight per cent mortgages that two per cent of the face of the mortgages was to be the commission to be paid by the Lewis Investment Company to L. A. Stewart—two per cent of the face of the loan.

Q. When were these commissions paid?

A. They were paid at different times; as a general rule, once a month.

Q. Were they paid with each loan or at stated periods?

A. Sometimes the draft was made out to include commissions; sometimes not. It might be left for several loans to accumulate and paid then or whenever it was asked.

The Court: State whether the borrower ever paid Mr. Stewart the commission outside of these papers.

A. No, sir.

Q. Mr. Davis: What was the usual custom in making these second mortgages as to whom the second mortgage ran?

A. I am inclined to think, as a general rule, to the investment company.

Q. You spoke of the second mortgage being equal to two per cent for the entire term of the loan?

A. Yes, sir.

Q. In a five year loan it would be ten per cent of the principal sum.

A. Yes, sir.

Q. You spoke of the Lewis Investment Company paying two per cent of the face of the mortgage to Mr. Stewart?

A. Yes, sir.

Q. Was that the rule in loans for shorter period than five years?

A. I think that rule applied to loans in general. That

was the general understanding. Loans as they were made were made on certain terms.

The testimony of the witness Russell is not contradicted by any officer of the defendant, although George H. Lewis, the president, and Robert P. Maynard, the secretary of the investment company, were both examined as witnesses on the trial. Mr. Lewis in his testimony states that he was acquainted with Mr. Stewart, and knew him while he was a resident of Des Moines, which was before his removal to Omaha; that witness declined to appoint Stewart agent, but admits that he requested him to send in applications for loans, and that the defendant had made about one hundred loans on applications taken by Stewart; that the latter in every case gave his opinion as to the desirability of the loan, and in some instances they were made on his recommendation and approval without an examination of the real estate offered by the borrower as security. The witness further testified: "We make it an imperative rule that no one shall represent himself as agent of the Lewis Investment Company in any way, or publicly advertise himself as such. Mr. Stewart asked us to permit him to advertise himself as our agent in 1886, but we refused him. We have refused it to Messrs. Muir & Gaylord of this city. This is our universal custom and practice in all our business."

The record further discloses that about a year after Stewart began to procure applications for the defendant he was required to, and did, give a bond to the investment company in the sum of $10,000, signed by two sureties, conditioned as follows:

"Whereas, the said L. A. Stewart is engaged in the business of negotiating and making loans secured by mortgage upon real estate in the city of Omaha and in the county of Douglas, outside the city of Omaha and in other portions of the state of Nebraska;

"And whereas, in the course of said business, acting as

the agents of various parties desiring such loans, it is his practice to send applications to said Lewis Investment Company, and if such loans are accepted by them to forward the note or notes and mortgages securing the same, duly executed, to said company, and receiving from them in return the funds to fill the loans for which said Stewart makes drafts upon said Lewis Investment Company, or receives from said company such drafts, the same to be applied in payment of any mortgage or mortgages already upon the property securing said loans, or any mechanics' liens or unpaid bills for lumber or materials of any kind constituting a valid claim against any such real estate, paying the balance, if any, to the respective parties who have obtained such loans and made such notes and mortgages above referred to:

"Now, therefore, the condition of this obligation is such that if the said Stewart shall well and truly pay any and all funds received from such loans to the parties entitled thereto, and mortgage above referred to, and shall apply said funds in payment of any prior incumbrances existing on any piece of property upon which a loan is made by said Lewis Investment Company, so that the mortgage securing their loan shall be the first lien, except the current taxes, then, and in that event, this obligation shall be null and void, otherwise to be in full force and effect; it being the intent of this obligation to protect any person who may apply to said Stewart to procure him a loan through said investment company from any harm or loss by reason of any negligence or any wrongful act on the part of said Stewart, or any one in his employ, in the transaction of the business above referred to, including also the purchase and sale of real estate purchase-money mortgages, so called. But nothing in this bond contained shall be construed as constituting said Stewart the agent of said Lewis Investment Company, or as giving him any authority to bind them by any contract, expressed or implied."

If Stewart was agent of the borrower merely, as the defendant now contends, why was this bond required? Such action cannot be reasonably explained upon any other theory than that Stewart was the agent of the defendant, and that the bond was taken to protect the company against loss resulting from the agent's acts. Counsel for appellant calls attention to the clause in the bond to the effect that the instrument should not be construed as constituting Stewart as agent of the obligee therein named. If the defendant believed that the other provisions in the bond did not constitute Stewart its agent, why was the clause referred to inserted expressly disclaiming such agency? Doubtless the defendant hoped thereby to escape any responsibility for Stewart's acts, although it availed itself of the benefits of the agency. We decline to place a construction upon the instrument that would lead to the result indicated. The conditions contained in the bond established that Stewart was the agent of the lender, and the clause under consideration, especially in view of the entire course of dealing between the parties, should not be held as releasing the defendant from the responsibility which the law imposes upon a principal for the acts of his agent, so far as third parties are concerned. But, independent of the bond, the evidence establishes that the relation of principal and agent existed between Stewart and the defendant. It is uncontradicted that all applications for loans were taken on the defendant's printed blanks furnished by it to Stewart. The latter examined the property upon which each loan was made, and in every instance made a recommendation as to the value of the security. All mortgages and notes were prepared by the defendant and sent to Stewart, who, after procuring the same to be executed by the borrower, filed the mortgages for record. The money to pay out on the loan was sent to Stewart, who was required by the defendant to, and he did, pay out of the same all existing liens on the property, and the balance of the money

remaining, if any, he turned over to the borrower. All commissions on the numerous loans negotiated for the defendant were invariably paid by it to Stewart. These facts are entirely inconsistent with the theory advanced that the latter was the agent of the borrower merely. On the contrary, they establish beyond question that he represented the lender. An examination of the many letters, which passed between Stewart and the company, strengthens this view. Copies of more than seventy-five of the letters are incorporated in the bill of exceptions, the following being a fair selection from those written by defendant:

"DES MOINES, IOWA, Nov. 13, 1886.

"*Messrs. Stewart & Co., Omaha, Neb.*—DEAR SIRS: We received your favor of the 9th inst. inclosing the Inez Christensen bond November 1 for $900, with abstract of title and commission notes of $31.50. We hand you herewith N. Y. exchange for $900. When you send us the mortgage please also send the insurance policy for $1,850 as called for by the terms of the loan.

"We also enclose you N. Y. exchange in your favor for $68, being the balance due on the Wm. Gibson loan. This, as we wrote you, was sent by mistake to a party in the east and has just been returned to us.

"We also send you N. Y. exchange for $20 to cover the rebate due you on the McNair loan.

"Find herewith the Inez Christensen application made out on our form. Please have this signed and have two appraisers value the property as usual, and return to us the other papers.

"We also send you a lot of our subrogation slips, which we would ask you to have attached to all policies connected with loans made for us before these policies are sent on. This will save us much trouble.

"Yours truly,    LEWIS INVESTMENT CO.,

"ROB'T MAYNARD, *Sec.*"

"Des Moines, Iowa, Nov. 16, 1886.

" *Mr. L. A. Stewart, Omaha, Neb.*—Dear Sir: We herewith hand you N. Y. exchange for $40, being the rebate allowed you on the Gibson $2,000 loan. This was overlooked when we sent you the McNair rebate. Please acknowledge receipt.

"Yours truly,     Lewis Investment Co.,
"Rob't P. Maynard, *Sec.*"

" Des Moines, Iowa, March 9, 1887.

"*Mr. L. A. Stewart, Omaha, Neb.*—Dear Sir: Mr. R. E. Gaylord of your city has taken a block of the stock of our company, and we have agreed with him that he shall have the control of our business in Omaha and that vicinity. We should, however, be very glad to receive any applications which you may have and would recommend, but in accordance with the arrangements entered into with Mr. Gaylord, they should come to us through his office. You can make such arrangements with him in this connection as you and he may agree upon. We would assure you that we have been well pleased with all your efforts in our behalf, and with the loans which were sent to us, and it is from no dissatisfaction with you that we have taken this step. We will hope that in the future we may continue to receive the benefits of your active and wide-awake business tact.

"We would be obliged if you were to send us in a statement of what rebates may be due you on the various loans made through you since our last settlement. There are various matters in connection with them, such as insurance policies, perfecting of the abstracts, etc., which are not yet completed. As soon as these matters are closed up in each case we will remit what is due you.

"Yours truly,     Lewis Investment Co.,
"Rob't P. Maynand, *Sec.*"

"June 14, 1887.

" *Mr. L. A. Stewart, Omaha, Neb.*—Dear Sir: Refer-

ring to the various loans which have been negotiated for us by you, there is insurance still needed as detailed on the various loans specified. [Then follows a list of the loans.] All of these loans bear date of several weeks or months back and we cannot understand why the insurance has not been furnished us before. Please stir around and poke up the various parties and send us on the insurance in some first-class company without further delay.

"Yours truly,    LEWIS INVESTMENT CO.,
"ROB'T P. MAYNARD, *Sec.*"

Under date of February 9, 1887, the defendant, in reply to a letter written by Mr. Stewart enclosing the application of Barney Calelly, says: "We conclude to make the papers and send to you, but we will fill the loan only upon condition that some one from your office shall go and personally inspect the property, and give us a full and careful report and estimate of value. We are afraid the loan is too heavy. Would rather cut it down to $2,000 or $2,200, than complete it at this figure. We shall require first-class eastern insurance on the loan, particularly if made at this amount. If possible, I would rather you would go personally to look at the land, as Russell, I think, is a little inclined to be enthusiastic, and to overrate values. Perhaps I am mistaken on this point."

No disinterested person can peruse the whole correspondence between Stewart and the defendant without being convinced that the former was the agent of the latter in the negotiation of loans and in paying out the moneys thereon to the borrower. The manner in which the business was conducted is not susceptible of any other reasonable interpretation than that Stewart was in fact the defendant's agent, and was so considered by the company.

But it is urged that the relation of principal and agent ceased on March 9, 1887. If the agency terminated on that day, and Stewart acted for the plaintiff merely in negotiating the loan in question, then Jensen must bear the

loss occasioned by the failure of Stewart to pay the money over to him.   The letter written by the investment company, bearing date March 9, a copy of which appears above, is relied upon to support the defendant's contention.   This letter does not in express terms revoke the agency, nor does it contain language from which such an inference must necessarily be drawn.   True, it states that Mr. Gaylord is to have the control of the defendant's business in Omaha and vicinity; but we think the proper construction to be placed upon this language, when taken in connection with the remainder of the communication, is that Stewart was not superseded by Mr. Gaylord, but that the latter had the general management of the defendant's business in Omaha, and that the applications thereafter taken by Stewart should pass through Mr. Gaylord's hands.   It will be observed that the letter states: " We should, however, be very glad to receive any applications which you may have and would recommend.   *   *   *   We will hope that in the future we may continue to receive the benefit of your active and wide-awake business tact."   This does not indicate that the defendant expected Stewart to cease negotiating loans for it.   The contrary idea is conveyed.   Plaintiff's application was taken on one of the defendant's printed blanks and was forwarded by him to the company direct after March 9, the letter transmitting the application reading as follows:

"MARCH 22, 1887.

"*Robert P. Maynard, Sec'y, Des Moines.*—DEAR SIR: I enclose application and contract for $1,200 loan to Rasmus P. Jensen.   Been expecting Mr. Gaylord home, but as he is away we send it to you, but the commission should be credited to his account.

"The application speaks for itself, and I think is a safe loan.   I inspected the property personally on the 17th, and found it about as represented, and should consider $5,000 a low valuation.

"Truly yours,                    L. A. STEWART.

"P. S.—The cable line is already in front of said premises. Property is selling at about $100 per front foot in the neighborhood."

To the above letter the defendant, under date of March 23, replied as follows: "Referring to the Rasmus P. Jensen $1,200 application, we will accept the same subject to Mr. Gaylord's approval, and forward you papers herewith for their usual course. We, of course, will want to see the abstract and examine the same before the money is paid out on the loan. We also return the Jensen application so that you can fill, in the same handwriting, the description of the property."

It appears from the testimony that plaintiff's application took precisely the same course, and that the loan was made through Stewart in the same manner, as had been the custom in making loans prior to March 9, except that Mr. Gaylord approved the loan. The Jensen papers were sent to Stewart for him to have executed. He filed the mortgages for record, and the money was paid to him by the defendant to close the loan. The only thing Mr. Gaylord had to do with the transaction was to approve the application. If the defendant believed that the latter was its sole agent at Omaha, why were not the Jensen papers and the money to pay out on the loan sent to Mr. Gaylord? The failure to do so is convincing proof that the company regarded Stewart as its agent in the transaction, which in fact he was.

It is disclosed that the plaintiff, at the time of his making the application for the loan, also signed a writing addressed to L. A. Stewart, which states: "I hereby appoint you my agent and attorney to negotiate for me a loan of $1,200, with interest at eight per cent per annum, payable semi-annually." This paper also recites: "I authorize you to procure an abstract of title to said premises. And I hereby agree, in consideration of your services in the negotiation of said loan, to pay you or the assignee of this

contract a commission of ———— per cent on the amount
loaned, the actual cost of abstract of title, and for perfect-
ing the same, and also recording the mortgage,  *   *   *
and my said attorney is hereby instructed and authorized
to pay off and discharge all existing liens on the above de-
scribed land with the proceeds of the loan applied for, pay-
ing me the balance after deducting the above named com-
missions and charges, and the money advanced to pay off
existing liens.  *   *   *  I farther agree that this contract
may be assigned to any person or persons from whom my
said agent may procure this loan." Counsel for appellant
insists that the foregoing writing, which we will hereafter
call a contract, constituted Stewart plaintiff's agent to ne-
gotiate the loan for him and to receive the money. It is
evidence tending to prove that the relation of principal and
agent existed, and it would be conclusive upon that point
if there were no other proof in the record upon the sub-
ject. But there is other evidence. It is shown that it was
the usual custom of the defendant to require all applicants
for loans to sign a similar agreement to the one before us,
and said contracts were invariably forwarded to the defend-
ant with the applications. That was done in this case.
The application signed by plaintiff in express terms au-
thorized the defendant to secure the loan for him. It re-
cites: "The undersigned hereby authorizes the Lewis In-
vestment Company, of Des Moines, Iowa, to procure for
me a loan of $1,200 for five years, to bear interest at eight
per cent per annum, payable semi-annually.  *   *   *  All
incumbrances will be removed before the completion of
this loan.  *   *   *  I will furnish a complete abstract
of title to said realty, showing the record of the above
mortgage as the first lien on said premises." The appli-
cation has this indorsement: "Negotiated by the Lewis In-
vestment Company, 316 West Fifth street, Des Moines,
Iowa." Plaintiff is not estopped by the provisions con-
tained in the above writing or contract from showing that

Stewart was not his agent.    The question of agency must
be determined from all of the testimony in the case.    This
point is sustained by the decisions of this court in *Olmsted
v. New England Mortgage & Security Co.*, 11 Neb., 487,
and *New England Mortgage & Security Co. v. Addison*,
15 Neb., 335.

It appears that when the application for the loan was
made there was a valid mortgage of record on the premises
in favor of one Byron Reed for the sum of $500, and
although the contract recites that Stewart is authorized
to pay off all liens out of the proceeds of the loan and
procure an abstract of title, the proofs fail to show that
he did either.    On the contrary, the Reed mortgage was
paid by the plaintiff on March 31, 1887, which was be-
fore the money was paid to Stewart.    Defendant must have
been aware of the existence of the mortgage given to Mr.
Reed when it paid over the money to Stewart, since the
lien was shown upon the abstract which had been furnished
it.    Appellant not having been apprised of the release of
the mortgage, it is unreasonable to suppose that it would
have paid the $1,200 to Stewart had it not regarded him
as its own agent in the transaction, and that with the money
he would discharge the mortgage.    It is not usual or busi-
ness-like for a lender to trust the agent of the borrower to
pay off existing liens upon the property out of the money
loaned.    Plaintiff did not know the contents of the paper
when it was signed.    He only applied for one loan, and
evidently did not intend to constitute both Stewart and the
defendant as agents to procure the money for him.    We
are satisfied the contract was a mere device, obtained for
the same purpose that the clause was inserted in the bond
given by Stewart, to the effect that it should not be construed
as constituting Stewart the agent of the investment com-
pany, namely, to enable the defendant to escape liability
for the acts of its agent.    The application and contract
should be construed together, and in the light of the prior

and subsequent dealings between Stewart and the defendant. So construing them, we are forced to the conclusion that the trial court was justified in holding that Stewart was the agent of the defendant for the purpose of disbursing and paying over the money to the plaintiff, and that he was not plaintiff's agent in the transaction. Defendant paid the money to Stewart at its peril, and must stand the loss. The judgment is

AFFIRMED.