## In re DANVILLE HOTEL CO., Inc.

CALDWELL & CO. v. CHERRY, and four other cases.

Nos. 4216, 4217, 4241, 4245, 4246.

Circuit Court of Appeals, Seventh Circuit.
February 11, 1930.

W. E. Norvell, Jr., of Nashville, Tenn., for appellants Liberty Central Trust Co., Miller, Caldwell, Heitzeberg, Carter, Caldwell & Co. and others.

V. W. McIntire, of Danville, Ill., for appellants Liberty Central Trust Co. and Miller.

Ross D. Netherton, of Chicago, Ill., for appellant Arthur A. Marer Co.

Wm. M. Acton, of Danville, Ill., for appellees Yeager, E. M. Weymer Co., and Carson-Payson Co.

Walter T. Gunn, of Danville, Ill., for appellee Cherry.

Before EVANS, PAGE, and SPARKS, Circuit Judges.

SPARKS, Circuit Judge (after stating the facts as above).

The primary question in cause No. 4216 is whether or not the trustee in bankruptcy can recover from Caldwell & Co. for money unexpended or misapplied, which was derived from the sale of the hotel company's bonds under the contract between appellant and the hotel company. In deciding this question it is well to remember that, if the trustee in bankruptcy recovers in this action, he must do so on the strength of his own title, and not on the weakness of his adversary's title. In comparative terms it is quite easy to determine the title of the trustee in bankruptcy to said funds, for he has exactly the same title which the bankrupt had at the time the petition in bankruptcy was filed. He has no more and no less than this. To determine what title the bankrupt had in the funds previous to its bankruptcy we must look to the underwriting agreement executed by Caldwell & Co. and the bankrupt, for it measures the rights and liabilities of all parties to this controversy so far as this fund is concerned.

All the parties hereto agree that this agreement is an underwriting contract, and that by its terms Caldwell & Co. agreed, for a valuable and sufficient consideration, to sell the bond issue of the hotel company or to purchase it in case it failed to sell the issue. It has been decided, without exception, we think, that such an instrument is not an agreement to loan money, but it is a guaranty either to sell or to buy the bonds, and the underwriter is in fact considered the ultimate purchaser of the bonds. Fraser v. Home Telephone & Telegraph Co., 91 Wash. 253, 157 P. 692; Stewart v. G. L. Miller & Co., 161 Ga. 919, 132 S. E. 535, 45 A. L. R. 559; Busch v. Stromberg-Carlson Tel. Mfg. Co. (C. C. A.) 217 F. 328.

By the terms of this underwriting agreement the underwriter was to deposit the proceeds of the bonds in some bank selected by the underwriter, and was to pay out from such sum, as the building progressed, such amounts and at such times and dates as the owner and underwriter might agree upon, or, upon failure to agree, as the underwriter might determine to be necessary and best.

Whether, under this agreement, Caldwell & Co. held and disbursed the funds as an agent of the bondholders or as an agent of the hotel company, is a question upon which the parties hereto differ. In determining this question it is helpful to consider the purposes of the parties in entering into such an agreement, and to examine the obligations placed upon each party thereto.

It was the purpose of the hotel company to have the sale of the bond issue guaranteed, that it might construct and pay for its building. Being engaged in the business of underwriting bond issues, it was evidently the purpose of Caldwell & Co. to protect its customers and patrons by putting on the market high-grade mortgage bonds, which should constitute a first lien on the property covered by the mortgage or deed of trust. It was the duty, as well as the purpose, of the underwriter to see that no prior liens attached. Its credit and business standing depended on it. The terms of the agreement explicitly show these facts to be true.

The underwriter reserved the right to select the trustee; it was to dictate the provisions of the trust deed; it required the hotel company to make monthly payments to it to meet the principal and interest as they matured; it required the owner to furnish such additional funds as might be necessary, when added to the proceeds of the bonds, to complete the improvements on the hotel property; it selected the bank or banks where the proceeds were deposited, and reserved the right to disburse the same in such amounts and at such times and dates as it might determine to be necessary and best; it reserved the right at all times to hold sufficient of said funds on deposit in said bank or banks to complete the building free from any and all

prior liens, and to stop disbursements at any time until such deficiency, if any, be made up by the owner; it required the owner to furnish it with waivers of liens and receipts for payment of moneys for material and labor as would, under the law, relieve the property from liens, so as always to maintain the trust deed or mortgage as a first lien against the hotel property; it reserved the right to disburse the proceeds from time to time on vouchers for materialmen, contractors, subcontractors, laborers, or others, upon receipt of the necessary waivers of liens; and to supervise generally the erection of the building and the disbursement of the moneys employed in its construction, to the end that the contract should be carried out so as to protect fully the purchasers and holders of the bonds.

These reservations and requirements were for the protection of the bondholders, and were very properly inserted into the underwriting agreement for the purpose of making the investment secure. Caldwell & Co. was charged with the carrying out of these provisions, and as such it was, to that extent, the protector of the bondholders' rights. While an underwriter may in some respects be the agent of the issuer of the bonds, yet, when the agent is to retain a portion of the money until a prior incumbrance is discharged, he does this for, and in so doing is the agent of, the owner of the bonds, who alone is interested in having the discharge before he parts with the money. If the agent acts for the issuer, then the agent's possession is the possession of the principal, and the latter may demand that the money be paid him without discharging prior claims against the property. Travelers' Ins. Co. v. Jones, 16 Colo. 515, 27 P. 807; Fraser v. Home Telephone & Telegraph Co., 91 Wash. 253, 157 P. 692; Larson v. Lombard Inv. Co., 51 Minn. 141, 53 N. W. 179; Jensen v. Lewis Inv. Co., 39 Neb. 371, 58 N. W. 100; McLean v. Ficke, 94 Iowa, 283, 62 N. W. 753; Hubbard v. Wallace Co., 201 Iowa, 1143, 208 N. W. 730, 45 A. L. R. 1065; Day v. Dages, 17 Ind. App. 228, 46 N. E. 589; Gibson & Young v. Davenport, 29 Ohio St. 309; Stockton v. Watson (C. C. A.) 101 F. 490.

In the case of Fraser v. Home, etc., supra, the court held that the underwriter of bonds, as a matter of law, is not an agent of the company whose bonds he sells. The other cases cited on this proposition are cases of loans and not of underwriting agreements, but the facts are analogous, and the principle of law governing each, in this respect, is the same. We hold, therefore, that in holding and disbursing the proceeds of the bonds Caldwell & Co. was acting as agent for the bondholders and not of the hotel company. As such agent it was bound to disburse said proceeds strictly in accordance with the directions imposed by the underwriting agreement. A failure to do this would have rendered it liable to its principal. Its plain duty was to see that no prior liens attached to the property. It was agreed by both parties that the mortgage or trust deed should at all times be a first lien, but the mere statement of this fact would not make it irrevocably so, because prior liens for labor and material, as the work progressed, might attach. Hence this was not an agreement to turn over to the hotel company all of the $630,000 absolutely and at all events, but this sum was to be paid in various amounts and at such times as the work progressed as Caldwell & Co. might determine necessary and best, and upon certain precedent conditions, and these conditions were such as would, if fulfilled, maintain the priority of the bondholders' lien. The hotel company agreed to these conditions, and specifically promised to present receipts and waivers of liens from materialmen, subcontractors, and laborers before their respective claims should be paid by Caldwell & Co.; and the hotel company further promised to furnish sufficient money, other than the proceeds of the bonds, to keep the property free from liens which might be superior to that of the bondholders.

There was no agreement on the part of Caldwell & Co. to pay any sum of money to materialmen, contractors, subcontractors, or laborers, but the agreement was to pay money for them, from time to time, upon receipt of the necessary waivers of liens and affidavits, which have the effect of waivers of liens, satisfactory to the underwriter. These conditions were not met by the hotel company. Counsel for the trustee in bankruptcy cite the case of Busch v. Stromberg, etc., Co. (C. C. A.) 217 F. 330, 331, and quote from it extensively. In that case Busch and others underwrote a million dollars of bonds for the telephone company, but before the subscription contracts became due the telephone company became insolvent and Busch refused to pay. He attempted to defend upon the claim that the underwriting agreement was a mere executory contract to loan money, and that no recovery could be had because (1) an action for specific performance would not lie; (2) the breach caused no damage, for the agreement to repay the loan offset the contract to make it; (3) no recovery can be had for refusal to advance money on overdue

bonds; and (4) the insolvency of the company and the worthlessness of the bonds relieves it of the previous obligations.

None of these questions are raised in the instant case. Each was decided adversely to the appellant, and very properly so.

In that case there was no claim that the telephone company had violated any agreement other than the agreement to pay the bonds when due. The court, however, used some language in its opinion which is very pertinent to the issues in the case at bar, and which lends no aid to the contention of the hotel company. It says:

"The subscribers might have provided in their agreement that they should be released from their undertaking in case the company became insolvent or, the bonds became worthless or depreciated in value. They did not do so."

In the instant case it was provided in the agreement that the hotel company should do certain things, which have heretofore been enumerated, before this money should be paid to it, or for its use and benefit. This it failed to do on account of financial inability which resulted in bankruptcy.

For the reasons as stated we hold that the trustee in bankruptcy had no right to have the sums in question turned over to him as a part of the assets of the estate of bankrupt.

The trustee in bankruptcy further claims that he is entitled to have these sums of money turned over to him for distribution to the parties who furnished the material and labor regardless of whether or not they had established mechanics' liens, and this was decreed by the court below. This is on the theory that, where a contract is made for the benefit of a third person, the third person may recover the benefit. We concede this proposition to be sound, but if there be conditions precedent imposed upon the third person, he must meet these conditions before there can be a recovery. We hold that the conditions are identical under which the trustee in bankruptcy and those furnishing labor and material are entitled to these funds, and that under this theory the laborers and materialmen are not entitled to the funds on account of failure to meet those conditions.

The lower court stated in its order that the trust deed, in the absence of waivers, was invalid as to all *lienholders* for labor and material; and that it was to prevent such prior liens that the parties stipulated that the proceeds should be disbursed as mentioned. In this we concur, but we find nothing by way of agreement or in the conduct of the parties to convince us that it was the intention of any of the parties that materialmen or laborers, or any one, who had no prior lien, nor the right to one, should be paid out of the proceeds of the bonds. The mortgage was a prior lien as to all such persons, and no agreement as to them was necessary, nor was it intended.

All persons having liens prior to the mortgage are entitled to be paid. When the property was sold by the trustee in bankruptcy such prior liens attached to the proceeds of the sale. The trustee, by order of the court, required the purchaser to pay to him the sum of $200,000 to secure the payment of all prior lien claimants, costs, and taxes. This was, and is now, deemed by all parties concerned sufficient to protect all prior lien holders.

We think the court erred in ordering Caldwell & Co. to pay any of the proceeds of the bonds to the trustee in bankruptcy. Whether or not there was a misapplication of funds by Caldwell & Co. we intimate no opinion, as we consider that to be a matter between the bondholders and Caldwell & Co., and that issue is not before us.

Cause No. 4245 is based on the same record and raises the identical question as cause No. 4216, the only difference being that in cause No. 4216 this court granted the appeal, and in cause No. 4245 the District Court granted the appeal. This decision, therefore, disposes of both cases.

In cause No. 4217 it is the theory of appellants that each appellee is estopped from asserting a lien upon the proceeds of the sale of the hotel property to the extent of the error in the amount of money acknowledged to have been received by it, as contained in its waiver presented to Caldwell & Co. by Benson, and that the appellees have no interest whatever in the bond proceeds. In regard to the conduct of Benson the referee, in his order, used the following language:

"Representations by Benson, Inc., to Caldwell & Company as to waiver of liens, amounts paid to the subcontractors in cash, and credits available by reason of representation that there were several hundred thousand dollars in stock substantially subscribed or paid for was unquestionably a misrepresentation that worked to the detriment and fraud of the holders of bonds as sold through Caldwell & Company, underwriters."

Upon review of this order the court, referring to Benson, said:

"His misrepresentations of fact were inducements to the payments of sums of money by the disbursing agent on the sale of bonds, which clearly would not have been paid except for his representations. * * * His fraud misled Caldwell & Company and the bondholders. * * *"

"The referee found the facts to be such that the claimant (Benson, Inc.) is estopped. * * * It has no standing in a court of equity. The referee's report upon this claim is approved."

It is quite apparent that all of these representations were ones upon which Caldwell & Co. and the bondholders had a right to rely, so far as Benson, Inc., was concerned; and they did rely upon them and were thereby damaged. It may be true that appellants relied upon other representations in the way of letters and an audit of the hotel's financial standing; yet the court found, and we think very properly so, that Benson, Inc., was precluded from recovery by reason of the fact that said appellants had also relied upon Benson's representations as enumerated in the referee's order. The question before us is, What connection, if any, did these appellees have with these representations of Benson? That appellees were negligent in executing the receipts and waivers cannot be doubted. The natural consequences of such acts are so far reaching that they could hardly be regarded as the reasonable acts of an ordinarily prudent person under any circumstances. That every person is presumed to intend the natural consequences of his acts is elementary. Appellees seek to avoid the charge of negligence herein by disclaiming any harmful intentions in respect thereto. They insist that they did not know the waivers were to be delivered to Caldwell & Co.; that they were executed at the request of Benson at the suggestion of Ætna Casualty & Surety Company, which was demanding that Benson secure from all the subcontractors waivers as to all that portion of the general contract price represented by Benson's profit and overhead. Appellees say the waivers were intended for the surety company only, and that Caldwell & Co. had no right to rely on them. The remarkable thing about this position is that they were addressed "to all whom it may concern," and the name of the surety company is not mentioned, nor is there one word contained therein concerning the purpose or the reason for the execution.

Surely the payment of these subcontractors' accounts was of the very highest concern to all the bondholders, and, this being true, the bondholders were entitled to rely upon the matters contained in the waivers just as much as if the waivers had been specifically directed to the bondholders. That these waivers, addressed as they were, should get into the hands of the disbursing agent of the bondholders is not to be wondered at, especially when they were delivered to Benson, who was very much interested in participating in the disbursement. This was but the natural consequence of the execution of the waivers and the delivery of them to Benson, and it will therefore be presumed that appellees intended that the bondholders should receive them and rely upon the contents.

Appellees insist, however, that the contents of the waivers were not sufficient to mislead appellant bondholders to their damage, but that the bondholders, through their disbursing agent, did not exercise ordinary care. On this subject appellees say (1) that Benson told the agent that the waivers were for the use and benefit of the surety company only; (2) that the waivers do not state that the amounts receipted for were cash, but they may have been for stock; (3) that the waivers showed the correct balance due the subcontractors.

As to the first reason assigned, the bondholders' agent denied Benson's statement, and both the referee and the court believed the agent, and we are bound by this finding.

It is true that each of the appellees had subscribed for a small amount of stock as part payment of its account, but not for any such amount as these waivers represent. Besides, all of the stock subscribed by the subcontractors was deposited in escrow with a bank at Danville, and it was there at this time, and of this fact the agent of the bondholders had knowledge. Appellees are not claiming that these were receipts for stock delivered, but they say they might have been, and that the bondholders' agent was negligent in regarding them as receipts for money.

We are not impressed with this argument. Appellees had received neither cash nor stock when they signed the waivers. The amounts in the waivers are stated both numerically and in writing, the dollar sign is used, and the word dollars is spelled. We are convinced that appellants' agent was not negligent in considering these waivers as receipts for that much cash. Besides, it makes no difference whether the amounts named be considered as cash or as stock. A payment of any part of the consideration named in the contracts, whether by cash or stock, would

reduce the owner's liability that much, and protect the bondholders' lien to that extent, and this was the fact that concerned the bondholders most.

It is said that the waivers showed the correct amount due as a balance. They do. They are about the only correct statements in them; and yet they are wrong in that they show balances instead of the original contract prices. Appellees virtually say: We have signed false receipts, we have misrepresented to you the several amounts of our original contracts, but the balances show the several amounts of our original contracts. If you had examined the original contracts you would have detected the fraud, but, not having done so, you are guilty of negligence.

We agree with appellees that a party desiring to claim the benefit of an estoppel cannot shut his eyes to obvious facts, or neglect information easily obtainable, and then charge his ignorance to others. But to what obvious facts did the bondholders' agent shut its eyes, or what information easily obtainable did it neglect? It did not have the several contracts. It knew the total cost; it knew the amount of the bond proceeds; and it knew that, if stock to the amount of $115,-350 had been sold and paid on subcontractors' contracts, there was sufficient on hand to satisfy the cash requirement of the contract of Benson, Inc. There were two things which it especially wanted to know, and these were: (1) Had a sufficient amount of stock been sold; and, if so (2), had the proceeds thereof been applied on the debts of the subcontractors? If these questions were truthfully answered in the affirmative, it could safely open up the bond proceeds. Benson answered these questions in the affirmative, and to substantiate his answers he produced one of the highest classes of evidence known to the law, i. e., voluntary admissions against interest, signed by the very parties to whom Benson said he had paid the money. Certainly there was no negligence in believing that these payments had been made. No reasonable man would ask for further proof of payment. These waivers proved more than payment; they proved that that amount of stock had been sold, because there was no other source from which additional money could come. We regard the statements of the amounts of the contracts and of the balances as of secondary importance so far as the disbursing agent was concerned. It had a right to believe that appellees would not misrepresent these facts to it. There was no apparent reason for it to question their motives

in this particular, and we think that appellees are not in any position to charge it with negligence for failing to do so.

We hold that the lower court erred in allowing liens to appellees upon any part of the bond proceeds in the hands of Caldwell & Co.; and that it further erred in allowing $28,200 of the claim of O. K. Yeager, and $7,500 of the claim of E. M. Weymer, and $13,500 of the claim of Carson-Payson Company, as prior and superior to the lien of the trust deed of Liberty Central Trust Company and H. J. Miller, trustees.

In relation to appellants' right to present the question of negligence to this court, it is sufficient to say that the conclusion of negligence in this case is a deduction from uncontroverted testimony, and in such event this court is at liberty to draw its own inferences and to make its own conclusions. Gilbert's Collier on Bankruptcy, 571; Remington on Bankruptcy, § 3872.

As to appellants' right to rely on estoppel by reason of negligence of appellees when the complaint is based on intentional acts of appellees, we are of the opinion that the word "intention" includes both express and implied intentions, and it is sufficiently broad to cover the negligence from which the implied intention arises. In any event, objections to matters of form and modes of procedure in the court below cannot be made for the first time in the appellate court. Campbell v. United States, 224 U. S. 99, 32 S. Ct. 398, 56 L. Ed. 684.

Cause No. 4246 is based on the same record and raises the identical questions as cause No. 4217, the only difference being that in cause No. 4217 this court granted the appeal, and in cause No. 4246 the District Court granted the appeal. This decision, therefore, disposes of both cases.

Whether in No. 4241 appellant Marer & Co. shall prevail in its appeal depends at least upon the answers to two questions:

1. Was any part of the articles furnished by appellant lienable under the Mechanics' Lien Law of Illinois?

2. Did appellant waive its lien, if it had one, in favor of the bondholders' lien?

If the first question is answered in the affirmative and the second is answered in the negative, this appeal should be sustained as to this appellant; but if either of the questions is otherwise answered, then appellant must fail.

That part of section 1, c. 82, Illinois Revised Statutes, which is applicable to this case reads as follows:

"That any person who shall by any contract or contracts, express or implied, or partly expressed or implied, with the owner of a lot or tract of land * * * for the improvement of, or to improve the same, furnish material, fixtures, apparatus or machinery, forms or form work used in the process of construction * * * altering, repairing or ornamenting any house or other building, walk * * * fence or improvements * * * or do landscape work * * * or perform services as an architect or as a structural engineer for any such purpose` * * * or perform labor or services as * * * mechanic, laborer, or otherwise * * * shall be known under this Act as a contractor, and shall have a lien upon the whole of such lot or tract of land * * * for the amount due to him for such material, fixtures, apparatus, machinery, services or labor, and interest from the date same is due * * * nor shall the taking of additional security by the contractor or subcontractor be a waiver of any right of lien which he may have by virtue of this Act, unless made a waiver by express agreement of the parties; and this lien shall attach as the date of the contract."

Sections 4, 7, 15, 16, and 39 of the same act read as follows:

"When the owner of the land shall fail to pay the contractor moneys justly due him under the contract at the time when the same should be paid, or fails to perform his part of the contract in any other manner, the contractor may discontinue work, and the contractor shall not be held liable for any delay on his part during the period of, or caused by, such breach of contract on the part of the owner; and if after such breach for the period of ten days the owner shall fail to comply with his contract, the contractor may abandon the work, and * * * shall be entitled to enforce his lien for the value of what has been done.

"No contractor shall be allowed to enforce such lien against or to the prejudice of any other creditor or incumbrance or purchaser, unless within four months after completion, or if extra additional work is done or material is delivered therefor within four months after the completion of such extra or additional work or the final delivery of such extra * * * material, he shall either bring suit to enforce his lien therefor or shall

file with the clerk of the Circuit Court * * * a claim for lien.

"Upon all questions arising between different contractors having liens under this act, no preference shall be given to him whose contract was made first.

"No incumbrance upon land, created before or after the making of the contract under the provisions of this act, shall operate upon the building erected, or materials furnished until a lien * * * shall have been satisfied * * * previous incumbrances shall be preferred to the extent of the value of the land at the time of making of the contract, and the lien creditor shall be preferred to the value of the improvements erected on said premises.

"This act is and shall be liberally construed as a remedial act."

We have carefully read the evidence bearing on this particular phase of the case and the authorities cited, and we are convinced that none of the material furnished by appellant Marer was lienable under the statute. The only part of the material furnished by appellant which can be seriously contended to be a part of the real estate is the carpets, which the evidence shows were glued to the floor; but even this method of physical connection appears from the evidence not to be so permanent, as witnessed by the fact that appellant at one time refastened some of the carpets which had become loosed, and at other times took a carpet up more than once to meet the whim of one of the officers of the hotel company. Permanency of fastening, however, is not controlling, but it is a fact to be considered, together with all the other circumstances, in determining the intention of the parties. We concur in the proposition of law cited by appellant that the intention of the parties is the predominating test as to whether an article, personal in character has become a part of real estate; and we are not at variance with the exception to this rule that the parties, by their intent, cannot declare a part of a building to be personalty where the rights of third persons are affected. The question of intention many times can best be determined from the voluntary acts of the parties previous to litigation. There can be no question about the original intention of the hotel company and the bondholders. They considered the furnishings personalty, for the hotel company gave a chattel mortgage upon it, and the bondholders received the mortgage.

But what about appellant—can it bring itself within the exception to the rule, as an innocent third person whose rights will be affected by the general rule? We think not, for the evidence convinces us that it too was of the same opinion until it filed its claim for a lien on December 15, 1927. At least this is the first act on its part to indicate that it regarded the materials furnished as a part of the realty. As further evidence that it regarded the materials as personalty, it required the hotel company to execute to it, to secure the payment of its account, a second and junior mortgage on the real estate, a thing that was absolutely unnecessary if appellant's contention is correct. Furthermore, appellant knew at the time it signed its contract that, before the bond proceeds would be disbursed, whoever secured the carpet and furniture contract would have to admit that such materials would not become a part of the realty, or to execute a waiver of lien. This was the mutual understanding of every one concerned. That this was the understanding of appellant is suggested by the letters it wrote to the bondholders' disbursing agent on October 13 and December 15, 1926. Appellant insists, however, that the statements in these letters relative to a release in favor of bondholders were merely voluntary and without consideration; but we are discussing now the question of intentions, and voluntary expression of intention does not require a consideration for its interpretation.

It may also be noted in this connection that appellant installed its last material and did its last work in the hotel in February, 1927; that a receiver was appointed for the hotel company on July 30, 1927, which was followed by an adjudication in bankruptcy on the 19th day of August, 1927; and yet, in the face of financial distress, appellant never filed its claim for a lien until December 15, 1927. It is true there were a few carpets which had neither been installed nor delivered, representing about $1,000 of the contract price; yet appellant had installed material valued at more than $121,000, and, if it considered its account lienable, why did it not file its claim within four months from the time the last work and material were provided, regardless of whether the contract had been completed, for the statute gave appellant this right if the delay was not caused by it, and appellant says that it was not. If appellant believed that its material had become a part of the real estate, why did it take the chance of losing the lien for $121,000 by deferring the filing of its claim for the lien until such time

as it would be permitted to complete the contract, when everything pointed to the fact that it never would be permitted to do so, by reason of the bankruptcy proceedings. This delay merely confirms our belief that appellant never intended that its material furnished should become a part of the realty. Having originally and voluntarily concurred in the intention of all the parties concerned, it cannot, at this late day, change that intention merely because matters have turned out disastrously.

We are also of the opinion that appellant waived any lien which it otherwise might have had. This is clearly shown by the mortgage which it received from the hotel company, and by the letters it wrote to Caldwell & Co. on October 13 and December 15, 1926. Appellant insists that these were voluntary statements and made without consideration. It is sufficient to say in this connection that each of these letters was prepared by Caldwell & Co. and sent to appellant accompanied by a demand that appellant sign and return them, which was pursuant to the original understanding of all the parties concerned; and that a further statement was then and there transmitted to appellant that, if they were not signed, further disbursement of bond proceeds would cease. They were signed by appellant without objection, but surely they cannot be considered as voluntary statements on the part of appellant.

We are also of the opinion that there was a valid consideration for these waivers, and that the bondholders fully performed their part of the contract, in so far as they were permitted to do so.

Appellant contends the consideration was that Caldwell & Co. should continue disbursement of proceeds. Even if this be the true consideration, we think the disbursing agent has complied with it according to the underwriter's agreement, although all the proceeds have not yet been disbursed. Appellant had knowledge of this underwriter's agreement and of the duties which the underwriter owed to bondholders in disbursing the bond proceeds, and the meaning of this consideration in question must be construed in the light of the knowledge which the parties had at that time. To "continue disbursements" implies the continuation of an act or acts which before had been satisfactory. The prior disbursements, so far as the contractor and subcontractors were concerned, had been made according to the underwriter's agreement. To have disbursed the bond proceeds differently would have been a violation of the trust

confided by the bondholders in their underwriter. We would be reluctant to construe appellant's intention to be that of seeking to have the underwriter violate such trust.

It is our opinion, however, that the continuation of disbursements was not the true consideration for the execution of the waiver. The award of appellant's original contract was the consideration for this waiver. The letters merely constituted agreements to do something which it had already obligated itself to do, and therefore appellant was in no position to demand a further consideration. The taking of additional security for a lienable debt does not, of itself, release the right of lien, unless there be a waiver by express agreement of the parties. In this case there was clearly an express agreement to waive the mechanics' lien, and in such event we may well look to the execution of the mortgage of appellant as a circumstance bearing on appellant's intention to waive liens in favor of the bondholders.

Under all the circumstances we hold that appellant did expressly waive whatever lien it had, if any, in favor of the bondholders' mortgage, and that the bondholders are proper parties to the proceeding within the meaning of Illinois Statutes, c. 82, §§ 1 and 11. We think the court was right in refusing a lien to appellant Arthur A. Marer & Co., and in allowing its account as a general claim, and the decree in cause No. 4241 is affirmed.

Causes Nos. 4216, 4217, 4245, and 4246 are reversed and remanded for further proceedings not inconsistent with this opinion.